UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

      *v.*                                   Case No. 21-cr-28

JAMES BEEKS,

        *Defendant.*

---

## JAMES BEEKS'S MOTION TO DISMISS COUNTS FIVE AND SEVEN OF THE SEVENTH SUPERSEDING INDICTMENT

---

James Beeks was indicted on allegations that he violated federal law by participating in the breach of the United States Capitol building on January 6, 2021. Relevant to this motion, the Seventh Superseding Indictment alleges that Mr. Beeks unlawfully entered and remained in the Capitol during a time when it was "restricted" due to Vice President Pence "temporarily visiting" the building, in violation of 18 U.S.C. § 1752(a)(1), (c)(1)(B). In addition, while inside the building, Mr. Beeks allegedly obstructed, impeded, or interfered with one or more law enforcement officers engaged in their official duties incident to a "civil disorder," in violation of 18 U.S.C. § 231(a)(3).

As discussed below, both counts must be dismissed. Count Five fails to allege the "restricted buildings or grounds" element of § 1752(a)(1), because the Capitol building and its grounds did not become "restricted" on account of the Vice President's presence in his own workplace. And Count Seven fails to allege the "civil disorder" element of § 231(a)(3), because the indictment contains no factual allegations that the purported "civil disorder" in the hallway between the Rotunda and Senate Chamber was of the type the statute criminalizes.

## BACKGROUND

The Seventh Superseding Indictment alleges that Mr. Beeks traveled to the U.S. Capitol on January 6, 2021, where he and others purportedly violated federal law. *See* Seventh Superseding Indictment, ECF No. 583 [hereinafter "Indict."]. This motion concerns two of the six counts against Mr. Beeks. Count Five alleges that Mr. Beeks entered and remained in the Capitol building unlawfully during a time when it was "restricted," within the meaning of 18 U.S.C. § 1752(a)(1), (c)(1)(B). Count Seven alleges that Mr. Beeks acted in a way that affected law enforcement officers' efforts to quell a "civil disorder," within the meaning of 18 U.S.C. § 231(a)(3).

**A.     Count Five depends on the Vice President's presence at the United States Capitol building on January 6, 2021, qualifying as a "temporarily visit."**

In Count Five, the indictment charges Mr. Beeks with violating § 1752(a)(1). Indict. ¶ 108. Section 1752(a)(1) criminalizes the act of unlawfully entering and remaining in certain areas, and it defines those areas. Specifically, subsection (a)(1) makes it illegal to "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so" or to "attempt[] or conspire[] to do so." 18 U.S.C. § 1752(a)(1). And subsection (c) defines "restricted buildings or grounds" as follows:

> (1)     the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>
> (A)     of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B)     of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C)     of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

2

*Id.* § 1752(c)(1). In addition, the statute defines "other person protected by the Secret Service" to mean "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection." *Id.* § 1752(c)(2). The Vice President is a Secret Service-protectee. *Id.* § 3056(a)(1).

Count Five purports to allege a violation of 18 U.S.C. § 1752(a)(1) on the theory that Mr. Beeks entered and remained in the Capitol building and grounds at a time when they were "restricted" by reason of the Vice President "temporarily visiting" the building. *See* Indict. ¶ 108; *see also* 18 U.S.C. § 1752(a)(1), (c)(1)(B). The charge points to specific paragraphs in the indictment, which allege that Mr. Beeks was unlawfully on "the restricted Capitol grounds"; more specifically, that he allegedly was in "the plaza in front of the east side of the Capitol," on "the steps [leading] to the Rotunda Doors," in the Rotunda, and in "the hallway connecting the Rotunda to the Senate Chamber." Indict. ¶¶ 77, 82, 84, 86–100. It also alleges that Vice President Pence was present at the Capitol on January 6, 2021, to preside over the opening, counting, and certification of electoral votes as part of a joint session of Congress. *See id.* ¶¶ 1, 6 (citing U.S. CONST. amend. XII; 3 U.S.C. § 15). Thus, Count Five rises and falls on the Vice President being a Secret Service protectee who can "temporarily visit" the Capitol, within the meaning of the statute. In light of these allegations, the nature of the Vice President's relationship to Congress and the Capitol building is central to Count Five.

The Vice President is an institutional player in Congress. Her role in the Senate is embedded in the very structure of the Legislative Branch: she serves as the President of the Senate and is responsible for providing the tie-breaking vote. U.S. CONST. art. I, § 3, cl. 4. The Vice President routinely is present in the Capitol building to fulfill her constitutional obligations. By way of example, Vice President Pence traveled to the Senate thirteen times in his tenure just to

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

cast tie-breaking votes; meanwhile, Vice President Kamala Harris visited the Senate fifteen times in 2021 alone to cast tie-breaking votes.[1] Further, the Constitution and federal law obligate the Vice President, at a set date and time, to preside over and participate in the process by which electoral votes for the office of the Presidency and Vice Presidency are opened, counted, and certified. U.S. CONST. amend. XII; 3 U.S.C. § 15.

To that end, the Vice President has a dedicated office reserved for her use in the Senate. That office has existed since at least the early nineteenth century.[2] The Vice President's "close proximity . . . to the Senate chamber has allowed the vice president easy access to the members when the Senate is in session," including "lobbying senators to vote against legislation [s]he oppose[s] and frequently lecturing senators on procedural and policy matters."[3] The Vice President's Room in the Senate building has hosted "ceremonial functions, informal party caucuses, press briefings, and private meetings" for decades.[4] Unsurprisingly, given its frequent and important use, the office is not a drab holding space; it is appointed with mahogany furniture,

---

[1] U.S. Senate, *Votes to Break Ties in the Senate*, https://tinyurl.com/ye8t4nu8 (last visited Mar. 10, 2022) [hereinafter "*Votes to Break Ties in the Senate*"].

[2] U.S. Senate, *About the Vice President (President of the Senate)*, https://tinyurl.com/2p8n43y9 (last visited Mar. 10, 2022).

[3] Office of the Senate Curator, *The Vice President's Room*, S. Pub. 106–7, https://tinyurl.com/3wyb9web (last visited Mar. 10, 2022) [hereinafter "*The Vice President's Room*"], at 3 (first quotation); *see* U.S. Senate, *About the Vice President — Historical Overview*, https://tinyurl.com/46rhuwyk (last visited Mar. 10, 2022) [hereinafter "*Historical Overview*"] (second quotation) (describing "active role" of John Adams).

[4] *The Vice President's Room*, supra note 3, at 3.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

a marble fireplace mantel, and fine art.[5] In contrast to her longstanding office in Congress, the Vice

President did not have an office in the West Wing of the White House until 1977.[6]

### B.    Count Seven depends on allegations that there existed a "civil disorder" that negatively affected commerce or a federally protected function.

Count Seven charges Mr. Beeks with violating 18 U.S.C. § 231(a)(3), which makes it a

crime to obstruct an officer trying to quell a civil disorder. That section of the U.S. Code provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—
>
> Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3).

By its plain text, § 231(a)(3) requires that the Government allege four elements. First, that

a "civil disorder" existed at the time of the defendant's alleged conduct. Second, that that civil

disorder "in any way or degree obstruct[ed], delay[ed], or adversely affect[ed] commerce or the

movement of any article or commodity in commerce or the conduct and performance of any

federally protected function." Third, that one or more "law enforcement officers" were lawfully

engaged in the lawful performance of their official duties incident to and during the commission

of that civil disorder. And fourth, that the defendant knowingly committed or attempted to commit

---

[5] *Id.* at 4–6.

[6] "Mondale was the first vice president to have an office in the West Wing of the White House." *The career of Walter Mondale, Carter's vice president, in pictures*, NBC, Apr. 19, 2021, https://tinyurl.com/5bxc5xns; *accord* Brock Brower, *The Remaking of the Vice President*, N.Y. TIMES, June 5, 1977, https://tinyurl.com/7td4wu7f ("Jimmy Carter allowed Fritz Mondale not just Whi[t]e House-room but his pick of any office that wasn't oval.").

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

an act with the specific intent to obstruct, impede, or interfere with those officers. *Id.*; *see also, e.g.*, *United States v. Rupert*, Case No. 20-cr-104 (NEB/TNL), 2021 WL 1341632, at *16 (D. Minn. Jan. 6, 2021) (listing elements based on *United States v. Casper*, 541 F.2d 1275, 1276 (8th Cir. 1976) (per curiam)); Final Jury Instructions, *United States v. Reffitt*, Case No. 21-cr-32 (D.D.C. Mar. 7, 2022), ECF No. 119, at 32 (similar articulation of elements in different order).

Thus, the Government must prove not only that a "civil disorder" existed, but also that it took one of the three forms enumerated in the statute. A "civil disorder" is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). And Congress made three types of "civil disorders" cognizable under § 231(a)(3): (1) a "civil disorder" that "obstruct[ed], delay[ed], or adversely affect[ed] commerce"; (2) a "civil disorder" that "obstruct[ed], delay[ed], or adversely affect[ed]. . . the movement of any article or commodity in commerce"; or (3) a "civil disorder" that "obstruct[ed], delay[ed], or adversely affect[ed] . . . the conduct or performance of any federally protected function." *Id.* § 231(a)(3); *see* ANTONIN SCALIA & BRYAN GARNER, READING LAW 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."); *see also, e.g.*, *United States v. Mostofsky*, Crim. Action No. 21-138 (JEB), 2021 WL 6049891, at *3  (D.D.C. Dec. 21, 2021) (Government could seek to obtain a conviction at trial "via the federally-protected-function prong" by proving a "civil disorder" that "obstructed, delayed, or adversely affected a federally protected function" (alteration adopted) (internal quotation marks omitted)); *United States v. Phomma*, Case No. 3:20-cr-00465-JO, 2021 WL 4199961, at *4 (D. Ore. Sept. 15, 2021) (Section 231(a)(3) concerns "civil disorders that affect interstate commerce").

In charging a violation of § 231(a)(3), the indictment largely parrots the statute. Count Seven alleges:

> [O]n or about January 6, 2021, within the District of Columbia, . . . JAMES BEEKS[] committed and attempted to commit and aided and abetted other persons known and unknown to the Grand Jury to commit an act to obstruct, impede, and interfere with a law enforcement officer, that is, law enforcement officers guarding the hallway between the Capitol Rotunda and Senate Chamber, while those officers were lawfully engaged in the lawful performance of their official duties, incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

Indict. ¶ 112. By cross-reference, Count Seven shines a spotlight on Paragraphs 94 through 96 of the indictment, in which Mr. Beeks is alleged to have "joined the mob" in the "northbound hallway" between the Rotunda and Senate Chamber and "push[ed] against a line of law enforcement officers guarding the hallway." *Id.* ¶¶ 94–96, 112. As such, it rests on allegations that, while inside the Capitol, Mr. Beeks purportedly joined a group that interacted with unidentified law enforcement officers located in a particular hallway inside the Capitol.

The indictment advances few other allegations to put facts on the bones of that boilerplate. There is no express allegation in Count Seven of what the grand jury understood the terms "commerce," "movement of any article and commodity in commerce," and "federally protected function" to be. To the extent those generic terms are fleshed out at all, Count Seven depends on the cross-referenced paragraphs from earlier in the indictment.

But those paragraphs contain few allegations concerning commerce. For purposes of § 231, "commerce" includes commerce across State or D.C. lines, between two points within a State or D.C. but involving interstate travel, or "wholly within the District of Columbia." 18 U.S.C. § 232(2). The indictment alleges that Mr. Beeks and others resided outside the District of Columbia

FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

but traveled to the District on January 6, 2021—i.e., they traveled across State lines. *See, e.g.*, Indict. ¶¶ 12, 22(d), 57–58, 60, 65. It also alleges that Mr. Beeks's purported co-conspirators walked from the Ellipse to the Capitol grounds and that Mr. Beeks "met up with and joined the group of co-conspirators" at the Capitol—i.e., that they traveled within the District. *Id.* ¶¶ 66–68, 78. And it alleges that Mr. Beeks and others personally damaged, attempted to damage, or aided and abetted others in damaging the Rotunda doors on the east side of the Capitol building, in an amount exceeding $ 1,000. *See id.* ¶¶ 86–89, 106.

Equally sparse are other factual allegations that might concern a "federally protected function." Section 232(3) defines a "federally protected function," for purposes of § 231, as "any function, operation, or action carried out, *under the laws of the United States*, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails." 18 U.S.C. § 232(3) (emphasis added). By definition, then, a "civil disorder" that affects the "conduct or performance of a federally protected function" is a "civil disorder" that affects the conduct or performance of a federal actor trying to execute her duties under federal law. The indictment alleges that Congress had convened a joint session to preside over the electoral vote count. Indict. ¶ 6. In addition, it alleges that United States Capitol Police were stationed near or just inside the Rotunda Doors, as well as outside on the east steps of the building. *Id.* ¶¶ 7, 9, 22(i), 74, 87. But it also distinguishes those officers from "other law enforcement" and alleges that those in the interior hallway at issue in Count Seven were simply "law enforcement officers." *Compare id.* ¶¶ 7, 22(i), *with id.* ¶¶ 96, 112.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**ARGUMENT**

The Court must dismiss any count in the indictment that fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment must "inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). And Rule 7(c) of the Federal Rules of Criminal Procedure "effectuates that understanding, requiring an indictment to contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting Fed. R. Crim. P. 7(c)(1)).

It is not enough for an indictment simply to parrot the statute and its generic terms. To survive a defendant's motion to dismiss, the indictment must set forth, on its face, the "essential facts" of the offense and "descend to particulars," beyond statutory boilerplate. Fed. R. Crim. P. 7(c)(1); *Russell v. United States*, 369 U.S. 749, 765 (1962); *United States v. Ballestas*, 795 F.3d 138, 148–49 (D.C. Cir. 2015). In other words, "the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." *United States v. Conlon*, 628 F.2d 150, 155 (D.C. Cir. 1980).

The indictment's sufficiency is based on its four corners. The court "is limited to reviewing the *face* of the indictment, and more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphasis in original). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

These pleading requirements align with the twin aims of an indictment. First, they ensure that it "furnish[es] the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, . . . [that it] inform[s] the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Hunter v. District of Columbia*, 47 App. D.C. 406, 409–10 (D.C. Cir. 1918); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Hillie*, 227 F. Supp. 3d 57, 78–79 (D.D.C. 2017) (criminal charges must "be specific enough to protect defendants from th[e] danger" of double jeopardy; the allegations must "establish the boundaries of the charged conduct" so that "a future prosecution for conduct arising out of these same charges would be barred"). As such, the sufficiency of the allegations in an indictment dovetails with a criminal defendant's rights under the Fifth and Sixth Amendments and the court's ability to answer questions of law concerning the charges.[7]

As discussed below, the indictment against Mr. Beeks fails to adequately allege a violation of either § 1752(a)(1) or § 231(a)(3). Specifically, Count Five does not allege the "restricted

---

[7] Courts in this District regularly dismiss counts in indictments that do not allege "essential facts." *See, e.g.*, Mem. Op., *United States v. Miller*, Case No. 21-cr-119 (CJN) (D.D.C. Mar. 7, 2022), ECF No. 72 [hereinafter "*Miller* slip op."], at 28–29 (in Capitol breach case, dismissing count that failed to allege violation of § 1512(c)(2)); *United States v. Guertin*, Case No. 1:21-cr-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022) (dismissing indictment that failed to allege violations of §§ 1343 and 1512(c)(2)); *United States v. Payne,* 382 F. Supp. 3d 71, 74–77 (D.D.C. 2019) (dismissing charge under § 922(g)(1)); *Hillie*, 227 F. Supp. 3d at 72–74 (dismissing child pornography-related charges); *United States v. Singhal*, 876 F. Supp. 2d 82, 95–96 (D.D.C. 2012) (dismissing charges under § 1001); *Sunia,* 643 F. Supp. 2d at 69, 78–81 (dismissing counts that failed to allege offenses under § 666(a)(1) and § 1505); *United States v. Brown*, Case No. 07-75 (CKK), 2007 WL 2007513, at *3–5 (D.D.C. July 9, 2007) (dismissing counts that failed to allege violation of § 1512(c)(2)).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

buildings or grounds" element of § 1752(a)(1). And Count Seven fails to allege the "civil disorder" element of § 231(a)(3). Accordingly, both Count Five and Count Seven must be dismissed.[8]

## I.      Count Five must be dismissed because it fails to allege a violation of § 1752(a)(1).

For Count Five to allege the "restricted buildings or grounds" element of § 1752(a)(1), as charged, the Capitol must be a place the Vice President is "temporarily visiting" when presiding over the opening, counting, and certification of electoral votes. The meaning of "temporarily visiting" and, in turn, the sufficiency of the allegations in Count Five, are questions of law for the Court to decide. *See United States v. Jabr*, Crim. No. 18-0105 (PLF), 2019 WL 13110682, at *6–7 (D.D.C. 2019).

For the reasons discussed below, Count Five cannot stand. "Temporarily visiting" does not encompass travel to and from one's own office or place of business. And if the term could plausibly encompass that conduct (contrary to the ordinary person's understanding), then it is ambiguous and lenity counsels in favor of the narrower construction. Because the Government chose to proceed exclusively on a narrow "temporarily visiting" theory, Count Five must be dismissed.

### A.      The Vice President does not "temporarily visit" the United States Capitol building when fulfilling her constitutional obligations.

#### 1.      *The ordinary person understands that even the Vice President does not "temporarily visit" her own office.*

The phrase "temporarily visiting" is not defined by the statute, so its ordinary meaning, fixed at the time of enactment, controls. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 210–12

---

[8] Mr. Beeks previously joined the motions that his co-defendants filed before he was indicted. Notice, ECF No. 539. As relevant to Count Five, he reasserts that only the Secret Service may "restrict" an area under § 1752, but the indictment fails to allege that the Secret Service did so here, and that § 1752(a)(1) is unconstitutionally vague as applied. *See* Def. Caldwell Mot., ECF No. 240, at 20–22; Def. Harrelson's Mot., ECF No. 278, at 26–31; Def. C. Meggs's Mot., ECF No. 386, at 11. As those arguments have been briefed and resolved, Mr. Beeks does not repeat them here. *See* Omnibus Order, ECF No. 415, at 3–4; Order, ECF No. 559, at 3.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

(2014) (where Controlled Substances Act did not define "results from," the Court gave that phrase its "ordinary meaning"); *see also* SCALIA & GARNER at 69, 78 (describing the ordinary-meaning and fixed-meaning canons). Based on dictionary definitions of "temporarily" and "visiting" from about 1971, when § 1752 was enacted, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it business, pleasure or sight-seeing, and for a limited time, which could be brief or extended while nonetheless remaining temporary." *United States v. McHugh*, Crim. Action No. 21-453 (JDB), 2022 WL 296304, at *20 (D.D.C. Feb. 1, 2022) (internal quotation marks omitted).

Two guardrails attend that definition. First, the phrase "temporarily visiting" includes an implicit normally-lives-or-works carveout, because the ordinary person would not "describe an ordinary commute from home to one's regular workplace as 'temporarily visiting' the office." *Id.* at *22; *see Wooden v. United States*, 595 U.S. ___, ___, Case No. 20-5279, 2022 WL 660610, at *4–5 (2022) (construing "occasions" in § 924(e)(1) in light of "how an ordinary person . . . might describe" it "*and how she would not*" (emphasis added)); *see also, e.g.*, *Young v. United States*, 943 F.3d 460, 463 (D.C. Cir. 2019) (construing "imposed" in § 401(c) of the First Step Act according to its "ordinary usage"). Second, "temporarily visiting" should not be interpreted as though it means "physically present"—that is not what Congress wrote. *See McHugh*, 2022 WL 296304, at *22. If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee is or will be physically present, then it would have omitted the phrase "temporarily visiting" or actually written "physically present."

It follows that Vice President Pence was *not* "temporarily visiting" the Capitol when fulfilling his constitutional obligations. Instead, he was simply going to work. The Constitution obligates the Vice President to be physically present in the Senate with some frequency, not only

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

to preside over the opening, counting, and certification of electoral votes every four years, but also to cast tie-breaking votes as needed on legislation and judicial nominations. And the number of times Vice Presidents Pence and Harris have been present in Congress over the last five years solely to provide tie-breaking votes—28 times—speaks to the frequent, routine nature of the Vice President's work in the Capitol.[9] In other words, the Vice President does not "temporarily visit" the Capitol—he works there.

That conclusion is consistent with the weight of history. The Vice President has had an office in Congress and conducted official business from that office since nearly the Founding. Historically, vice presidents are in the Capitol not only for the electoral vote certification, but also to cast tie-breaking votes, lobby senators, and hold "informal party caucuses, press briefings, and private meetings" from that office.[10] And, critically, when Congress enacted § 1752 in 1971, the Vice President *did not even have an office in the West Wing*.[11] In other words, Congress enacted § 1752(a)(1) with the background understanding that the Vice President's office historically has been and remained in the Capitol building. *See, e.g.*, *Abuelhawa v. United States*, 556 U.S. 816, 823–24 (2009) (declining to interpret 21 U.S.C. § 843(b) to reach a result in conflict with the background understanding against which Congress legislated). Accordingly, there is no reason to think that, at the time it enacted § 1752, Congress understood the Capitol to be somewhere the Vice President "temporarily visit[s]."

A more capacious reading of "temporarily visiting" would transform that phrase into a mere "physically present" requirement. Treating the Vice President's performance of her

---

[9] *Votes to Break Ties in the Senate*, supra note 1.

[10] *The Vice President's Room* at 3; *Historical Overview*, supra note 4.

[11] *See* Pub. L. No. 91–644, 84 Stat. 1891 § 18 (Jan. 2, 1971).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

constitutional obligations in her established place of work as a "temporary visit" blurs the distinction between travel to ordinary places of business for repeat purposes and limited travel to a location "for a particular purpose . . . and for a limited time." *See McHugh*, 2022 WL 296304, at *20 (internal quotation marks omitted). As the court in *McHugh* pointed out, the dictionary definition of "temporarily visiting," coupled with commonsense and everyday experience, means § 1752(c)(1)(B) refers to the latter, not the former. *See id.* Otherwise, *everywhere* the Vice President travels outside her residence would qualify as somewhere she is "temporarily visiting." And if Congress wanted to define "restricted building or grounds" to encompass anywhere the President or a Secret Service protectee is or will be physically present, then it would have done so. *See id.* at *22; *see also, e.g.*, *Fresco Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (where plaintiffs' preferred interpretation simply was "not what the statute says," court of appeals declined to "scrub up for statutory surgery, excising some words and engrafting others," in order to adopt it).

The poor fit of treating the Capitol as a "restricted building" under § 1752(c)(1)(B) merely on account of the Vice President's physical presence there to do her job is cast in high relief when compared to the statute's application in other cases. For example, courts have held that "temporarily visiting" reaches an area near an airport hangar and a portion of a park restricted by the Secret Service ahead of a rally at which the President or Vice President appeared. *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (airport hangar); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (unpublished) (park). Airport hangars and parks are natural fits for the phrase "temporarily visiting," given the ordinary person's understanding that she "temporarily visits" a location where the person does not normally live or work. *See McHugh*, 2022 WL 296304, at *21. Meanwhile, the Vice President's time in the Capitol, where she has a permanent office and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

frequently appears to fulfill her constitutional obligations, is entirely unlike a brief stop in an airport hangar or park to give a one-off speech. *See also Jabr*, 2019 WL 13110682, at *7–10 (plain meaning of "the White House or its grounds" in § 1752(c)(1)(A) did not include "the U.S. Treasury Building and its grounds").

> 2.    *The only court that has addressed this issue reached the opposite result on faulty reasoning that creates constitutional questions.*

Although recognizing many of these points, the court in *McHugh* reached a contrary conclusion based on faulty reasoning. The court declined to apply the ordinary meaning of "temporarily visiting," including its normally-live-or-work carveout, to the allegations that the Capitol was "restricted" due to the Vice President's presence there. It reasoned that "the Vice President's working office is in the West Wing" and "anyone with a working knowledge of modern American government" understands that the Vice President "is principally an executive officer who spends little time at the Capitol and likely even less in her 'office' there." *McHugh*, 2022 WL 296304, at *22. Thus, according to *McHugh*, Vice President Pence was "temporarily visiting" his own office at the Capitol (even though the ordinary person understands that one does not "temporarily visit" one's own office) because the Vice President has another office that everyone knew he used more frequently. In other words, in shoehorning this theory into § 1752(c)(1)(B), the court rejected the ordinary person's understanding of what "temporarily visiting" means when it comes to the Vice President, specifically, without any basis in the statutory text.

That logic creates fair notice problems. Due process requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Nothing in the statutory text signals to the reader that the ordinary meaning of "temporarily visiting" applies to the Vice President differently than any other Secret Service protectee. Plus, under *McHugh*'s reasoning, the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

regularity of the Vice President's physical presence in the Capitol building, judged against "modern" practice, dictates whether she is "temporarily visiting" that building, which, in turn, dictates whether an individual is unlawfully in a "restricted area." This means the statute's reach expands and contracts based on fluid, unidentified factors—the frequency with which the Vice President casts a tie-breaking vote, her personal preference for working in her Senate office, her travel schedule, etc. Such indeterminacy provides no parameters by which the ordinary person can discern when the Vice President is "temporarily visiting" the Capitol and, in turn, know when the building is "restricted" for purposes of § 1752(a)(1); it specifies "no standard of conduct at all." *See United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)); *see also, e.g.*, *United States v. Davis*, 588 U.S. ___, ___, 139 S. Ct. 2319, 2324, 2336 (2019) (holding that § 924(c)(3)(B) is unconstitutionally vague, given that its "language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence").

A comparison is helpful and further counsels against reaching the same result as in *McHugh*. In *United States v. Class*, the D.C. Circuit recently assessed whether 40 U.S.C. § 5104(e), which prohibits the possession of firearms on the grounds of the Capitol, was unduly vague on account of the law making it difficult to determine whether a certain parking lot fell within the restricted area. 930 F.3d 460 (D.C. Cir. 2019). The court of appeals held that the law was not vague because it defined the restricted area "by a map and a specific list of intersections and streets that are part of the public law," meaning, "[a] citizen concerned about violating the ban need not . . . speculate about the uses the various parcels of land. He must simply . . . open the statute book—even if here he may need two." *Id.* at 468–69. By comparison, under *McHugh*'s reading of § 1752(c)(1)(B), the ordinary person could not look to a statute book (or even along a

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"circuitous route" of resources) to determine if the Capitol building is "restricted" on account of the Vice President "temporarily visiting" it. *Cf. Class*, 930 F.3d. at 467. Instead, the law would be fluid and subject to sudden change. Indeed, even if the "ordinary person" is someone "with a working knowledge of modern American government" (which the defense doubts; *contra McHugh*, 2022 WL 296304, at *22), she would have no reason to think the modern Vice President "likely spends little time" in her Senate office based on recent observations—Vice Presidents Pence and Harris have been in the Capitol nearly thirty times in the last few years *just* to provide a tiebreaker vote. As such, *McHugh*'s interpretation of § 1752(c)(1)(B) does not provide the "sufficient definiteness" that due process requires.

**B.    To the extent "temporarily visiting" is ambiguous, principles of lenity and constitutional avoidance counsel in favor of a narrower construction.**

At best, the term "temporarily visiting" is ambiguous. The most straightforward (and correct) reading of "temporarily visiting" is the one *McHugh* discerned and should have applied: a Secret Service protectee's travel to a location for a particular purpose and lasting a limited time, excluding travel to and from the protectee's own place of work. Alternatively, as the court in *McHugh* concluded, the phrase might be read more broadly to reach a Secret Service protectee's temporary travel to his or her own office, provided the ordinary person knows that, in recent years, the protectee does not spend much time in that office (but instead, uses another office). 2022 WL 296304, at *22.

Principles of lenity demand that the court adopt the narrower construction. A defendant should not suffer surprise at the hands of an ambiguous law; "when the government means to punish, its commands must be reasonably clear." SCALIA & GARNER at 299; *accord Wooden*, 2022 WL 660610, at *15 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). Thus, when a

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

reasonable doubt persists about a statute's meaning even after employing tools of statutory interpretation to try to resolve it, the court should adopt the reading that favors the defendant. *See Moskal v. United States*, 498 U.S. 103, 108 (1990); *accord, e.g.*, *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1246 (D.C. Cir. 2008) (rule of lenity, as described in *Moskal*, supported adopting narrower construction of 18 U.S.C. § 1028A(a)(1)).[12] Here, applying the rule of lenity, the Court should read "temporarily visiting" in § 1752(c)(1)(B) to exclude the Vice President's trips to her own office—whether in the Capitol building or the West Wing. That reading is consistent with the ordinary person's understanding of the phrase and avoids a vague and obscure description of when a protectee's travel to a place triggers criminal liability under § 1752(a)(1) for those in the vicinity. And it accords with the course the Supreme Court has charted. *See, e.g.*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 n.8, 408–09 (2003) (applying rule of lenity when construing "obtain" in the Hobbs Act and favoring "the familiar meaning of the word" over a "vague and obscure" description); *Miller* slip op. at 28 (after concluding § 1512(c)(2) was subject to "two plausible interpretations," adopting the narrower interpretation in light of principle of lenity and dismissing count for failure to allege an offense within that narrower meaning);

---

[12] There is ambiguity in the case law over the level of ambiguity required to trigger the rule of lenity. While recent statements from the Supreme Court suggest the rule applies only where there is a "grievous ambiguity," the rule's historical origins indicate a less stringent standard. *See, e.g.*, *Wooden*, 2022 WL 660610, at *17 (Gorsuch, J., concurring) ("This 'grievous' business does not derive from any well-considered theory about lenity or the mainstream of this Court's opinions. Since the founding, lenity has sought to ensure that the government may not inflict punishments on individuals without fair notice and the assent of the people's representatives."); *Miller* slip op. at 9 (describing conflicting standards for applying rule of lenity); *see also* SCALIA & GARNER at 298–99 (acknowledging various standards exist for applying rule of lenity and opining that *Moskal*-stated standard most closely aligns with the rule's policy interest in visiting the consequences of an ambiguous law "on the party more able to avoid and correct the effects of shoddy legislative drafting"). Even if the standard is "grievous ambiguity," rather than persistent doubt, lenity counsels in favor of the narrower construction of § 1752(c)(1)(B) at issue here.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*Guertin*, 2022 WL 203467, at *3–4 (to the extent any question remained about whether indictment alleged an offense under § 1343 based on whether "obtaining money or property" could mean "maintaining money or property," lenity counseled in favor of resolving that ambiguity in defendant's favor; count dismissed).

Similarly, principles of constitutional avoidance counsel in favor of adopting the reading of the statute that does not raise questions about the statute's legitimacy. The presumption of constitutionality and the constitutional-doubt canon allow the judiciary to uphold ambiguous legislation. The former "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional" and the latter "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality." *Davis*, 139 S. Ct. at 2332 & n.6; SCALIA & GARNER at 247–48. In light of the due process concerns that attend construing the statute to reach a Secret Service protectee's travel to and from his or her own office, contrary to ordinary understanding and based on that individual protectee's personal predilections and practices, the Court should decline to adopt that reading. *See, e.g.*, *United States v. Cano-Flores*, 796 F.3d 83, 91–94 (D.C. Cir. 2015) (constitutional avoidance principles counseled reading statute not to authorize imposition of forfeiture based on total revenue of conspiracy on mid-level manager defendant, given Eighth Amendment concerns).

### C.   Count Five should be dismissed for failure to allege an offense.

It follows that Count Five must be dismissed because its allegations simply do not align with the statute's text. A person does not "temporarily visit" her own office or place of business, even when that person is the Vice President of the United States. Accordingly, Count Five must be dismissed because its allegations, even if proven, would not be sufficient to permit a jury to find a violation of § 1752(a)(1) was committed. *See, e.g.*, *Guertin*, 2022 WL 203467, at *2–6

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

(dismissing count that could not state an offense under § 1343 as a matter of law based on theory alleged; wire fraud statute does not criminalize scheme to "maintain" something); *Payne*, 382 F. Supp. 3d at 76–77 (dismissing indictment that could not state an offense under § 922(g)(1) as a matter of law based on theory alleged; prior convictions had been expunged by certificates that did not expressly include prohibition on firearm possession and, therefore, could not support § 922(g)(1) charge); *Brown*, 2007 WL 2007513, at *3–5 (dismissing counts in indictment that failed to allege violation of § 1512(c)(2) as a matter of law based on theory alleged; D.C. Superior Court grand jury allegedly obstructed was not a "Federal grand jury" within the meaning of § 1515(a)(1)).

If there is a hole in the statute, then it is for the legislature, not the judiciary, to patch. Congress can write another law if it decides § 1752(a)(1) should reach the allegations here. But stretching § 1752(c)(1)(B) to fit this indictment is not the solution. Instead, "[r]espect for due process and the separation of powers suggests a court may not, in order to save Congress th[at] trouble, . . . construe a criminal statute to penalize conduct it does not clearly proscribe." *Davis*, 139 S. Ct. at 2333. The Constitution envisions that expansions of law come from Congress, not courts. *See, e.g.*, *Scheidler*, 537 U.S. at 409 ("a significant expansion of the law's coverage must come from Congress, and not from the courts.").

To be clear, concluding that the allegations here fall outside the ambit of § 1752(c)(1)(B) does not undermine the Government's ability to prosecute those who enter the Capitol building or grounds unlawfully or those who threaten the Secret Service's protection of the Vice President. The Government has plenty of other provisions in the United States Code to prosecute similar alleged misconduct, and it has done so in numerous other cases arising from the Capitol breach. *See, e.g.*, 18 U.S.C. § 3056(d); 40 U.S.C. § 5104(e)(2)(D), (E), (G); Judgment, *United States v.*

*Nelson*, Case No. 21-cr-344-1 (JDB) (D.D.C. Dec. 15, 2021), ECF No. 58 (conviction for violating 40 U.S.C. § 5104(e)(2)(G) arising from Capitol breach).[13] Further, the Government remains free to prosecute violations of § 1752(a)(1) based on the Vice President's travel to any other location "for a particular purpose . . . and for a limited time" that is *not* a trip to her own office building. *Cf. McHugh*, 2022 WL 296304, at *20. Put simply, the Government had other charging choices, and it chose wrong here. Count Five must be dismissed.

## II.   Count Seven must be dismissed because it fails to allege a cognizable "civil disorder."

Count Seven is as infirm as Count Five. It fails to adequately allege a "civil disorder" that triggers liability under § 231(a)(3). By cross-reference to Paragraphs 94 through 96 of the indictment, Count Seven rests on the alleged hallway altercation between law enforcement and a "mob." *See* Indict. ¶ 112. The allegations that Mr. Beeks and others pushed against a line of law enforcement officers in the hallway between the Rotunda and Senate chamber may adequately allege a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the . . . person of any other individual." 18 U.S.C. § 232(1) (definition of "civil disorder"). But, as described below, there is no factual allegation that that "civil disorder" had a relationship to commerce or a "federally protected function"—an allegation that the statute requires.

---

[13] A search of the Department of Justice's "Capitol Breach Cases" chart indicates that there have been at least 331 prosecutions for violations of 40 U.S.C. § 5104 arising from the Capitol breach on January 6, 2021. *Capitol Breach Cases*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/usao-dc/capitol-breach-cases?combine=picketing (last visited Mar. 10, 2022) (search for "picketing" (used in 40 U.S.C. § 5104(e)(2)(G)) identifies 331 results).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### A.   The indictment does not allege a "civil disorder" that negatively affected "commerce" or "the movement of any article and commodity in commerce."

None of the indictment's paragraphs alleges that the purported "civil disorder" in the hallway between the Rotunda and Senate chamber was one that affected commerce. It is the "civil disorder" *itself* that must have the effect on commerce or the movement of an article or commodity in commerce. *See Mostofsky* 2021 WL 6049891, at *4 (Section 231(a)(3) is within Congress's Commerce Power to enact because "it requires that the 'civil disorder' during which the act 'to obstruct, impede, or interfere with' a law-enforcement officer performing his duties occurs [sic] must be one that 'in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce'"). But the only allegations in the indictment that arguably concern commerce *predate* the existence of the purported "civil disorder" at issue in Count Seven. Mr. Beeks and others' alleged travel to and within the District was complete *before* Mr. Beeks allegedly entered the Capitol building. And the damage to the Rotunda doors (to the extent such damage even qualifies as "commerce") was complete *before* he allegedly reached the hallway between the Rotunda and Senate chamber. What remains is simply the indictment's parroting of the statutory language, without any allegations of essential fact—and that alone is not enough. *See Russell*, 369 U.S. at 765; *Conlon*, 628 F.2d at 155. Thus, the indictment fails to allege a "civil disorder" of either commercial flavor contemplated by the statute.

### B.   The indictment does not allege a "civil disorder" that negatively affected the conduct or performance of a "federally protected function."

Also absent from the indictment is any allegation that the purported "civil disorder" in the hallway was one that negatively affected a "federally protected function." As a preliminary matter, there is no express allegation of a "federally protected function" in the indictment. While the indictment alleges that Congress had convened a joint session to preside over the opening,

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

counting, and certification of electoral votes (Indict. ¶¶ 1, 6), Congress's certification of electoral votes is not a "federally protected function" within the meaning of § 231, because Congress is not a "department, agency or instrumentality" (*United States v. Nordean*, Crim. Action No. 21-175 (TJK), 2021 WL 6134595, at *14 (D.D.C. 2021); *see also* Mem. Op. & Order, ECF No. 558, at 12 (indicating same)).

Nor does the indictment allege that the officers in the hallway themselves were performing a "federally protected function." There is no allegation that those officers were *federal* actors trying to execute their duties under *federal* law. Instead, the indictment alleges only that they were "law enforcement officers." Indict. ¶¶ 10, 96, 112. And the generic reference to a "law enforcement officer" is not an allegation of fact that the officers were federal actors performing a federal function, because the statute defines "law enforcement officer" capaciously. It includes not only federal and state actors enforcing federal law, but also federal and state actors enforcing state and local law, and state militia members working to restore state and local law during a civil disorder. 18 U.S.C. § 232(7). In light of that statutory definition, an allegation as to the identities of the officers is necessary "to assure that the [defendant's alleged conduct] . . . generally relates to the officer's performance of official duties" cognizable under the statute. *See Russell*, 369 U.S. at 764 (indictment must contain allegations of fact that go to the "very core of criminality" under statute charged); *cf. Williamson*, 903 F.3d at 130–32 (indictment adequately alleged an offense under § 115 where it not only "parrot[ed] the statutory language" but also "specif[ied] . . . *the identity of the threatened officer*" (emphasis added)). Accordingly, in light of the way Congress chose to

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

write § 231, an allegation that a "law enforcement officer" was "guarding the hallway" is not an allegation that that officer was performing a "federally protected function."[14]

Surrounding allegations in the indictment do not fill the hole. Although the indictment alleges that the Capitol Police were present at the Capitol building, it does not allege that they were in the northbound hallway, where the "civil disorder" purportedly occurred. Instead, the indictment expressly alleges that those officers were in *different* areas of the Capitol building and on its grounds, namely, guarding the Rotunda Doors and outside on the east steps of the Capitol. *See* Indict. ¶¶ 7, 9, 22(i), 87 (Capitol Police guarding and just inside Rotunda Doors); ¶ 74 (Capitol Police outside on east steps of Capitol). And, notably, the indictment refers to the Capitol Police officers as distinct from "other law enforcement officers" who were present. *See id.* ¶¶ 7, 22(i). Reading the indictment as a whole, this indicates the "law enforcement officers" in the hallway between the Rotunda and Senate chamber are *not* alleged to be Capitol Police—if they were, the grand jury would have alleged as much, as it did elsewhere in the indictment. *See, e.g.*, *Hitt*, 249 F.3d at 1025–26 (affirming dismissal of count that failed to allege a timely charged conspiracy based on "a common-sense reading of the indictment"; "[i]f the government envisioned a broader common goal for the conspirators . . . it was obligated to ensure that the Grand Jury stated that goal with certainty and thereby conformed to the 'basic principles of fundamental fairness' underlying the two key purposes of an indictment—notice to the defendant and protection against

---

[14] Mr. Beeks's argument is not academic. Multiple local law enforcement agencies responded to the Capitol breach on January 6, 2021, including Montgomery County police officers from Maryland, who "were one of the first teams to report." Khalida Volou, *Montgomery Co. officers honored for responding to Capitol riots*, WUSA9 (May 4, 2021), https://tinyurl.com/y75d55rx; *see also* Melissa Howell, *Prince George's County police honored for Capitol riot response*, WTOPNEWS (Feb. 17, 2021), https://tinyurl.com/5xj7ycua/.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

double jeopardy" (quoting *Russell*, 369 U.S. at 763)). As such, the indictment also fails to allege a "civil disorder" that negatively affected a "federally protected function."

### C.      Count Seven should be dismissed for failure to allege an offense.

Not every "civil disorder" falls within the ambit of § 231(a)(3)—only those that affect commerce or a federally protected function, as the statute describes. This means that an indictment must contain allegations of fact that, if true, would bring the particular "civil disorder" alleged within the reach of the statute. But with respect to that indispensable element, the indictment contains only statutory boilerplate, not "enough detail to apprise [Mr. Beeks] of the particular offense with which he is charged." *See Conlon*, 628 F.2d at 155. Missing is any allegation of fact that there existed a "civil disorder" of the kind cognizable under § 231(a)(3). *See, e.g.*, *Miller* slip op. at 28–29 (in Capitol breach case, dismissing count under § 1512(c)(2) because statute requires "that the defendant have taken some action with respect to a document, record, or other object" and indictment did not allege such action).

Count Seven's boilerplate does not adequately inform Mr. Beeks of the charge against which he must defend himself. The statutory text alone does not put Mr. Beeks on notice of the exact crime with which he is charged, let alone allow this Court to determine the sufficiency of the charge. *See, e.g.*, *Hunter*, 47 App. D.C. at 410 (dismissing indictment that failed to allege sufficient facts "that would enable defendants to make an intelligent defense, much less to advise the court of the sufficiency of the charge in law to support a conviction"). It is unclear whether Mr. Beeks should be prepared to defend himself against allegations that the civil disorder affected commerce (let alone how it did so), the movement of an article or commodity in commerce (let alone what that article or commodity was), or certain officers' performance of a "federally protected function" (let alone what that function was).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Nor is the boilerplate sufficient to guard Mr. Beeks's Fifth and Sixth Amendment rights to be prosecuted only on the particular offense the grand jury authorized and to be protected against double jeopardy. Instead, Count Seven leans exclusively on the generic terms of the statute, reciting *all three* theories of a cognizable "civil disorder" without descending to the particulars of any one. This leaves the Government free to present a theory to the petit jury that the grand jury never intended when making its charging decision here. And it amplifies the risk that Mr. Beeks may be prosecuted a second time for the same conduct. Courts in this district have dismissed counts in indictments for these very reasons. *See, e.g.*, *Hillie*, 227 F. Supp. at 77–79 (dismissing child pornography charges because, *inter alia*, indictment's generic language left the court to "guess as to what was in the minds of the grand jury at the time they returned the indictment" and left it "not at all clear that a future prosecution for conduct arising out of these same charges would be barred"); *Sunia*, 643 F. Supp. 2d at 77–80 (dismissing obstruction charges because, *inter alia*, indictment did not allege facts from which knowledge element of offense could be inferred, meaning court could not "say with any degree of certainty that a group of the defendants' fellow citizens found these allegations to be probably true, but instead would have to guess as to what was in the minds of the grand jury at the time they returned the indictment" (alterations adopted; citations and internal quotations marks omitted)).

A bill of particulars would not correct the indictment's deficiency. Count Seven is not simply unclear, it is *invalid* in light of its failure to allege the essential facts supporting an element of a § 231(a)(3) offense. And "while a *valid* indictment can be clarified through a bill of particulars, an *invalid* indictment cannot be saved by one." *Hillie*, 227 F. Supp. 3d at 81; *accord Russell*, 369 U.S. at 770. Allowing the Government to fix a deficient indictment with a bill of particulars would usurp the role of the grand jury, preclude fair notice, and allow gamesmanship by the prosecution.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

For example, the Government cannot now claim that the officers in the hallway were Secret Service officers, performing their statutory duties under 40 U.S.C. § 3056, because there is no allegation in the indictment indicating that that was what the grand jury believed when it returned the indictment. *See United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) (per curiam) (bill of particulars could not fix deficient indictment because reciting statutory boilerplate gave the government "a free hand to insert the vital part of the indictment without reference to the grand jury"); *United States v. Thomas*, 444 F.2d 919, 922–23 (D.C. Cir. 1971) (bill of particulars cannot cure an indictment that omits factual allegations of a material element of the offense; to allow otherwise "would be to allow the grand jury to indict with one crime in mind and to allow the U.S. Attorney to prosecute by producing evidence of a different crime," which "would make it possible for the U.S. Attorney to usurp the function of the grand jury by supplying an essential element of the crime and, in many cases, would violate due process by failing to give the accused fair notice of the charge he must meet"). Thus, ordering the Government to produce a bill of particulars that details the "civil disorder" alleged in Count Seven would not be enough to save Count Seven.

It follows that Count Seven must be dismissed. A Magistrate Judge presiding in the Eastern District of Wisconsin recently recommended dismissing a § 231(a)(3) charge where the indictment tracked the statute but advanced no allegations of fact, leaving the defendant "guessing what specific action the government attributes to him." *United States v. Howard*, Case No. 21-CR-28, 2021 WL 4342134, at *6–7 (E.D. Wis. June 3, 2021), *issue mooted by superseding indictment as stated in* 2021 WL 3856290, at *5 (E.D. Wis. Aug. 30, 2021). Similarly, Count Seven leaves Mr. Beeks to guess at an essential element of the offense—the nature of the "civil disorder" he purportedly prevented law enforcement officers from quelling. It must be dismissed.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## CONCLUSION

The Seventh Superseding Indictment contains two counts that fail to allege a criminal offense. Even accepting as true Count Five's allegations that Vice President Pence was present in the Capitol on January 6, 2021, at a time when Mr. Beeks also was present in the building without authorization, those allegations do not constitute a crime under § 1752(a)(1), (c)(1)(B) because the Vice President cannot "temporarily visit" his own workplace. To hold otherwise is to stretch the statutory language beyond its shape and call into question whether the statute provides fair notice of the conduct it prohibits. Further, the indictment provides nothing but parroted statutory language to allege the "civil disorder" element of a violation of § 231(a)(3) in Count Seven, and such boilerplate is not sufficient to satisfy constitutional pleading requirements. Nor can that deficiency be cured with a bill of particulars, which would circumvent the grand jury. Accordingly, for all these reasons, Counts Five and Seven must be dismissed as to Mr. Beeks.

Dated at Madison, Wisconsin, this 11th day of March, 2022.

Respectfully submitted,

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger (D.D.C. Bar No. D00483)
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 E. Mifflin Street, Suite 1000
Madison, WI 53703
Tel.:  (608) 260-9900
Email:  jessica_ettinger@fd.org

Joshua D. Uller (WI Bar No. 1055173)
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Avenue – Room 182
Milwaukee, WI  53202
Tel.:  (414) 221-9900
Email:  joshua_uller@fd.org

*Counsel for James Beeks*

28

**CERTIFICATE OF SERVICE**

On this 11th day of March, 2022, I filed the foregoing document electronically with the

Clerk of the Court for the United States District Court for the District of Columbia by using the

Court's CM/ECF system, which will provide electronic service on all counsel of record.


*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger