UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        *Plaintiff,*

       *v.*                      Case No. 21-cr-28 (APM)

JAMES BEEKS,

        *Defendant*.

## REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS FIVE AND SEVEN OF THE SEVENTH SUPERSEDING INDICTMENT

James Beeks moved to dismiss Counts Five and Seven of the Seventh Superseding Indictment for failure to allege an offense.[1] As outlined in that motion, he explained that Count Five proceeded on a theory that was not legally viable—the Vice President cannot "temporarily visit" the U.S. Capitol within the meaning of 18 U.S.C. § 1752(a)(1), (c)(1)(B). And he argued that Count Seven failed to allege an essential element of 18 U.S.C. § 231(a)(3), because it contains no allegations of fact that, if true, would support the existence of a cognizable "civil disorder."

The Government's opposition changes nothing. As explained at greater length below, the Government tries to avoid the deficiencies in the indictment by twisting the statutory language of § 1752 to fit its theory of the case and ignoring that liability under § 231(a)(3) depends on particularized facts that must be (but are not) alleged. As a fallback position, it proffers facts *not* alleged in the indictment. None of the Government's arguments salvages Count Five or Count Seven.

---

[1] Beeks's Mot. to Dismiss, ECF No. 638 [hereinafter "Mot."].

I.    **As a preliminary matter, this Court cannot consider new, unalleged facts when assessing whether Count Five or Count Seven adequately alleges an offense.**

The Government's response invites the Court to consider facts *not* alleged in the indictment, but that is not permitted. With respect to Count Five, the Government asserts in its opposition—but not in the indictment—that "two other Secret Service-protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings." Gov't's Opp., ECF No. 645 [hereinafter "Opp."], at 6. And with respect to Count Seven, the Government now asserts that the "federally protected functions" adversely affected by the "civil disorder" were the U.S. Capitol Police's protection of the Capitol building and grounds, generally, as well as the Secret Service's protection of the Vice President and his family. *Id.* at 14–15. It also asserts for the first time that the "civil disorder" affected commerce because it caused the mayor of the District of Columbia to impose a curfew that had an immediate effect on businesses and a longer-term effect on shipment patterns. *Id.* at 15. And it identifies the law enforcement officers that Mr. Beeks purportedly obstructed as members of the Metropolitan Police Department. *Id.* at 14. But these allegations appear nowhere in the Seventh Superseding Indictment, and this Court "is limited to reviewing the *face* of the indictment, and more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphases in original) (internal quotation marks omitted). Accordingly, these new factual allegations cannot be considered when resolving Mr. Beeks's motion to dismiss.

II.    **The Government's arguments do not render Count Five sufficiently pleaded.**

In its opening brief, the defense established that whether Count Five alleges a violation of 18 U.S.C. § 1752(a)(1) rises and falls on a question of law: Can the Vice President "temporarily visit[]" the U.S. Capitol, where she has a permanent office to which she routinely commutes to perform her constitutional duties? The defense submits that the answer is: No, she cannot. The

Federal Defender Services
of Wisconsin, Inc.

ordinary person would not understand "temporarily visiting" to include the act of going to and from one's own workplace, as the Vice President does when commuting to and from her standing office at the Capitol. What's more, permitting the definition of "temporarily visiting" to turn on the frequency with which any particular Vice President uses her office in the Capitol creates a fair notice problem, as it tethers the breadth of the statute to personal predilections—a moving target about which the ordinary person could only guess. And, if the phrase is ambiguous, then principles of lenity and constitutional avoidance counsel in favor of construing it more narrowly, in favor of Mr. Beeks.

In response, the Government defends Count Five based on a strained theory of synonyms. It posits that "temporarily visiting" really means "physically present," which, it says, makes § 1752 a comprehensive coverage provision—an area becomes "restricted" (and criminal liability attaches) wherever the Vice President goes outside the White House or his residence. *See* Opp. at 5–6. It buttresses that distortion of the plain text with a quick pivot to purposivism and the threat of (what it deems to be) absurd results. *See id.* at 7–9. Along the way, the Government offers no response to the concerns that Mr. Beeks raises concerning fair notice. And it impermissibly invites the Court to consider facts not alleged in the indictment. *Id.* at 6–7.

As set out below, none of the Government's arguments saves Count Five. The Government has twisted the meaning of "temporarily visiting" to create a "mere presence" requirement, and that simply is not what Congress wrote. The Government's resort to statutory purpose and policy cannot displace the plain text of the statute. In the end, it is for Congress to decide if the plain text leaves the statute incomplete. Finally, although the Government offers new allegations and calls on new cases that have touched on this issue, neither should persuade this Court that Count Five may stand.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**A.    The Government's plain text argument falls flat: "temporarily visiting" does not mean "physically present," even when the statute is read as a whole.**

1.    The Government purports to begin with the plain text of § 1752, but it does so with blue pencil in hand. It broadly interprets "temporarily visiting" to require only that the Secret Service-protectee be "physically present" in a particular location. Opp. at 5. The Government is not reserved about the switch in syntax on which its argument rests. Rather, throughout its brief, it emphasizes Vice President Pence's "physical presence" in the Capitol as the defining feature of Count Five. *See id.* at 6 ("Because Vice President Pence was physically present . . . , the U.S. Capitol was automatically designated . . ." (alteration adopted and internal quotation marks omitted)); *id.* ("Given the presence of the Vice President, the U.S. Capitol plainly qualified . . ."); *id.* at 7 (subsections of § 1752(c)(1) should be read to "encompass the locations where the protectee is, or will be, physically present"). And it emphasizes that this is consistent with the statutory text, because it reads § 1752(c)(1)(B) to "define[] the restricted area by reference to the location of the protectee—not his office." *Id.* at 6; *accord id.* at 8 (statute should be read "to protect[] the President and Vice President in their official homes and wherever else they go").

But that is not what Congress wrote. As the court in *United States v. McHugh* cautioned: "interpreters should heed the language of the statute and be wary of reading 'temporarily visiting' to mean, in effect, 'physically present.'" Criminal Action No. 21-453 (JDB), 2022 WL 296304, at *22 (D.D.C. Feb. 1, 2022). Instead, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it business, pleasure or sight-seeing, and for a limited time, which could be brief or extended while nonetheless remaining temporary"—but a person does not "temporarily visit" his or her own workplace. *Cf.* at *20 (internal quotation marks omitted); *see also* Mot. at 12. The Government reduces the statutory text to a "mere presence" requirement— precisely what *McHugh* warned against.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The Government also makes no effort to explain why the ordinary person would read "temporarily visiting" to mean being "physically present" at one's office. Reading it that way bypasses the Supreme Court's recent reminder that statutory language *must* be evaluated by "how an ordinary person (a reporter; a police officer; yes, even a lawyer) might describe [the usage]— *and how she would not*." *Wooden v. United States*, 595 U.S. ___, ___, 142 S. Ct. 1063, 1069 (2022) (emphasis added). Dictionary definitions "are not dispositive." *Yates v. United States*, 574 U.S. 528, 538 (2015). Thus, while it is theoretically possible that "temporarily visiting" *might* encompass going to and from one's ordinary workplace, that possibility is not controlling. Instead, the phrase must be read as the ordinary person would use it; and the ordinary person would not say that she "temporarily visit[s]" her own office. Instead, she would say that "she goes to work."[2]

2.     The Government looks to the statute's structure to support its position (Opp. at 7, 8–9), but reading § 1752(c) as a whole does not counsel in favor of the Government's proposed interpretation. The Government claims that reading § 1752(c)(1)(A) and (B) together makes clear that the statute "encompass[es] the areas where a protectee lives, works, and temporarily visits." Opp. at 7. In other words, the Government submits, § 1752(c)(1) should be read to afford comprehensive coverage to the Vice President, no matter where she is at any given moment. *Id.* at 8 (reading those sections "together protects the President and Vice President in their official homes and wherever else they go").

---

[2] The Government makes much of one sentence in the defense's motion that used the words "traveled to" and "visited" to describe the Vice President being at the Capitol building. Opp. at 5. But even the Supreme Court sometimes is profligate in its use of important terms. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("This Court, no less than other courts, has sometimes been profligate in its use of the term ['jurisdiction'].") So, too, was the defense profligate in its use of those words in that one sentence.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The trouble with the Government's conclusion is that it does not comport with the statute's structure. In defining "restricted buildings or grounds," Congress did not pen a catch-all provision; rather, it defined that term through discrete, enumerated spaces or occasions. It picked three:

- the White House, Vice President's official residence, and their grounds;

- places where the President or a Secret Service-protectee "is or will be temporarily visiting"; and

- places restricted in connection with a specially designated event.

*See* 18 U.S.C. § 1752(c)(1). The Government's analysis ignores altogether the third bullet point, subsection (C), which has nothing to do with the Vice President. If Congress had wanted to provide comprehensive coverage, then there would be no need to list out categories of designated areas. *Cf.* Mem. Op. & Order, ECF No. 596, at 3 (explaining that § 1512(c) contains a "catch-all" provision, while § 1512(a), (b), and (d) "contain a finite list of proscribed ways in which to violate the statute"). Instead, Congress would have used the very language that the Government uses in its brief—"wherever else they go" or are "physically present." Congress knows how to write a catch-all clause. And § 1752(c)(1)(B) isn't one.

3.     Ultimately, the Government asks this Court to follow the approach in *McHugh* without addressing any of the faults the defense highlighted in *McHugh*'s analysis. It encourages this Court to conclude that, even if the ordinary person understands that one does not "temporarily visit[]" his own workplace, Count Five should stand because "the U.S. Capitol is not the Vice President's *regular* workplace." Opp. at 7 (emphasis added) (citing *McHugh*, 2022 WL 296304, at *22). But it offers no explanation for how the ordinary person could discern a "regular workplace" from an "irregular" one. *Compare* Mot. at 15–16, 19, *with* Opp. at 7. Meanwhile, when arguing this very issue before Judge Nichols, the Government recognized the potential for "difficult line drawing in terms of when – at what point someone has temporarily visited" a

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

workplace. Tr. of Argument, Feb. 28, 2022, *United States v. Fischer*, No. 21-cr-234 (D.D.C.) [hereinafter "*Fischer* Tr."], ECF No. 74, at 25; *see also id.* at 21.[3] But here the Government offers no solutions; it relegates its response to a two-sentence footnote that does not address the argument. Opp. at 9 n.1.

> **B.    The Government's reading of § 1752 elevates the statute's purpose over its ordinary meaning.**

The Government defends its strained reading of the statute with a misguided emphasis on the statute's purpose and a policy interest in protecting the Vice President. Of course, neither point can overcome the statute's plain text. And, in any event, the Government's argument is without merit.

1.     The Government asserts that Congress must have intended its reading of the statute because a general protectionist purpose motivated its enactment. It notes that, "[i]n drafting Section 1752, Congress sought to protect 'not merely the safety of one man but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world.'" Opp. at 8 (quoting *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016)). And it highlights that, over time, Congress has effectuated that purpose by "broaden[ing] the scope of the statute and the potential for liability." *Id.* at 9 (quoting *United States v. Griffin*, 549 F. Supp. 3d 49, 56 (D.D.C. 2021) (emphasis omitted)). Therefore, the Government reasons, the statute's purpose justifies reading § 1752(c)(1)(B) broadly—so broadly as to transform "temporarily visiting" into a mere-presence requirement. *See* Opp. at 8–9.

---

[3] The *Fischer* transcript currently is available only through the courthouse's public terminal or by submitting an order to the court reporter. Out of respect for the court reporter, the defense has not attached it as an exhibit to this motion. Undersigned counsel can e-mail it to the Court, if necessary.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

But neither case the Government cites supports its conclusion. The language the Government plucks from *Caputo* is inapposite. It arises in the context of a facial constitutional challenge to § 1752(a)(1) by a defendant who claimed that vaulting over the White House fence was protected by the First Amendment. *See Caputo*, 201 F. Supp. 3d at 70. The court concluded that § 1752(a)(1), defined through subsection (c)(1)(A), was a reasonable and content-neutral regulation of a nonpublic forum. *Id.* Whatever legislative purpose may have motivated subsection (c)(1)(A) says little, if anything, about the legislative purpose behind subsection (c)(1)(B)—the subsection at issue here. Nor is *Griffin* of greater help. Although that court noted the general "direction of Congress's legislative march," it concluded that "[n]ot much" could be gleaned from § 1752's statutory history. *Griffin*, 549 F. Supp. 3d at 56. And it made both statements in the context of determining whether the statute requires the Secret Service (specifically) to cordon off an area—not in the course of interpreting "temporarily visiting." *See id.* at 55–56. To the extent § 1752's motivating purpose can be discerned at all, then, it does not clearly support the Government's reading. And neither *Caputo* nor *Griffin* supports its argument.

2.      The Government also stresses that the defense's reading threatens Congress's policy interest in protecting the Vice President, but that argument proves hyperbolic. *See* Opp. at 7. It simultaneously overstates the pragmatic effect of the statute's ordinary meaning and fails to account for other criminal statutes that serve that very policy interest. Even were the Court to adopt the defense's reading of § 1752(c)(1)(B), the Vice President would remain protected under the law and § 1752 would continue to deter unauthorized access to the Vice President in myriad other places. Indeed, Judge Nichols recently made this very point at an oral argument on this issue:

> It's not that he [the Vice President] would be unprotected. It would be that this one particular criminal statute might not apply because of the unique nature of the vice president in our constitutional structure, he may have actually not been temporarily visiting this

8

one particular location. It could be a very sui, sui, sui generis situation. It wouldn't distinguish between the vice president and his family anywhere else in the world. It would be only one place in Congress where he has this very, very unique role. . . .

[I]t's not as if such a holding would all of a sudden say that the Secret Service is sort of disabled from protecting the vice president vis-à-vis his or her children. Generally, that's no. It's only in Congress and *it's not even about protection. It's just whether this criminal prohibition would necessarily kick in.*

*Fischer* Tr. at 18, 26 (emphasis added). As Judge Nichols noted, adopting the defense's reading of § 1752(c)(1)(B) does not have far reaching consequences for criminal liability under § 1752(a)(1) and would not affect the Secret Service's protection of the Vice President. In fact, § 3056 alone appears to allow the Secret Service to set up perimeters around the Vice President at any given time as part of its functions and duties, as well as to make a warrantless arrest (at gunpoint even) of someone who interferes with their efforts. *See* 18 U.S.C. § 3056(a)(1), (c)(1)(F), (d). Thus, the Government overstates the potential harm when it broadly suggests that interpreting § 1752(c)(1)(B) based on the ordinary person's understanding would undermine its ability to protect the Vice President or its policy goal of "deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location." *Cf.* Opp. at 7.

### C.    The defense's reading does not produce a statutory "gap" or "illogical" results.

The Government also emphasizes that interpreting the statute as the defense suggests will create "a gap" and lead to "illogical" results that this Court is bound to avoid. *See* Opp. at 7, 9. That is not the case.

1.    The concern about "gaps" flows from a false premise. The Government asserts that "a gap" exists under the defense's view because it reads the statute to provide comprehensive coverage for Secret Service-protectees "wherever . . . they go." *Id.* at 8, 9. As set out above, that is not the case; the statute covers a discrete list of enumerated places. *See supra* at 6. Given that,

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the Government's parade-of-horribles loses its fear factor. The suggestion that coverage under § 1752(c)(1)(B) might not extend to every place the Government assumed it would is not horrible. *Cf.* Opp. at 7. Instead, it is consistent with the statutory language. Congress enacted a statute that is not as comprehensive as the Government contends.

Any "gap" is for Congress to fill in, not this Court. If Congress wanted criminal liability under § 1752(a)(1) to be triggered by a comprehensive, mere-presence provision for Secret Service-protectees, it would have said so. This Court's role is to enforce the text as-written and as understood by the ordinary person. As the leading tome on statutory interpretation explains, "gap" is a loaded word that warrants pause:

> What is a *gap*, anyway? It is not a void of some kind that makes a court's decision logically impossible. Instead, it is the space between what the statute provides and what the gap-finding judge thinks it should have provided. It is nothing else than the difference between the positive law and some other order considered to be better, truer, and juster. What has been omitted in the *gap* invariably turns out to be what the judge believes desirable—so gap-filling ultimately comes down to the assertion of an inherent judicial power to write the law.

ANTONIN SCALIA & BRYAN GARNER, READING LAW 95 (2012) (footnotes and internal quotation marks omitted). Thus, the Government's threat of "gaps" is simply an invitation for judicial legislation.

2.      The Government also is mistaken in claiming that the defense's reading produces absurd results that cannot stand. The D.C. Circuit has described the canon against absurd results as carrying a "high threshold." *Lovitky v. Trump*, 949 F.3d 753, 761 (D.C. Cir. 2020) (cited at Opp. at 7–8). To be absurd, the "statutory outcome" must "def[y] rationality by rendering a statute nonsensical or superfluous" or "create[] an outcome so contrary to perceived social values that

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Congress could not have intended it." *Id.* at 760. When the court can identify a plausible reason why Congress may have written the statute the way it did, the statute is not absurd. *Id.*

Here, the fact that Congress provided a list of enumerated spaces that triggers liability under § 1752(a)(1), rather than broad-strokes coverage of anywhere where a Secret Service-protectee is present, does not meet the absurdity canon's "high threshold." Restricting some areas and not others does not render the statute irrational or any provision superfluous. The Government identifies no "social values" with which a more limited reading of § 1752(c)(1)(B) is in conflict. And there are plausible reasons why Congress may have written the statute as it did. For example, Congress may have been exercising restraint in identifying those spaces that qualify as "restricted areas" so as to strike a balance between First Amendment rights and the compelling interest in ensuring the safety of a Secret Service-protectee. *See Lovitky*, 949 F.3d at 760–61 (defendant's reading of Ethics Act was not "absurd" where there was a "plausible reason[] why Congress may have written the statute to not forbid, or at least allow, inclusion of liabilities that are not required to be disclosed"). Thus, applying the test from the D.C. Circuit case the Government cites, the defense's reading of the statute is not so "absurd" as to be rejected.

### D. The two courts that have ruled on this issue in recent weeks have not grappled with the problems to which Mr. Beeks points.

The Government offers only passing citations to two newer opinions that addressed this issue since Mr. Beeks filed his motion. Opp. at 4–5, 8 (citing *United States v. Puma*, Criminal No. 21-0454 (PLF), 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Andries*, Criminal No. 21-93 (RC), 2022 WL 768684 (D.D.C. Mar. 14, 2022)). Those cases warrant further discussion, because their analyses should not sway the Court towards the Government's position.

In *Puma*, the court's analysis failed to account for the problems to which Mr. Beeks points. First, the Court defined "temporarily visiting" without meaningfully addressing the ordinary

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

person's understanding that one does not "temporarily visit[]" her own workplace. *See Puma*, 2022 WL 823079, at *17. As noted above, though, the Supreme Court has instructed courts to consider the ordinary person's understanding of statutory language. *See supra* at 5 (citing *Wooden*, 142 S. Ct. at 1069). Second, the court cited *McHugh* for the proposition that, even were that the ordinary person's understanding, it could not apply to the facts alleged because the Vice President's office in Congress is not her "regular workplace." *Puma*, 2022 WL 823079, at *18 (quoting *McHugh*, 2022 WL 296304, at *22). But the court did not explain how the ordinary person would know when an office qualifies as a "regular workplace."

The court's analysis in *Andries* proves no more helpful. That court acknowledged the "intuitive appeal to [the] suggestion that a person does not 'visit' a place where he maintains an office," and it agreed that it is "awkward to describe an ordinary commute from home to one's regular workplace as 'temporarily visiting' the office." *Andries*, 2022 WL 768684, at *16–17 (alteration adopted) (quoting *McHugh*, 2022 WL 296304, at *22). But it then treated the dictionary definition of "visit" as controlling. *Id.* at *17. The court held that, because the dictionary definition made it possible to "'visit' a location for the business purpose of working and meeting there," that definition trumped the ordinary person's understanding. *Id.* at *16–17. But this is in tension with the Supreme Court's guidance that dictionary definitions "are not dispositive." *See supra* at 5 (citing *Yates*, 574 U.S. at 538). In addition, although suggesting "temporarily visiting" might be ambiguous because it can be used different ways, the court did not apply the rule of lenity. *See Andries*, 2022 WL 768684, at *17. In the alternative, the court in *Andries*, too, cited *McHugh* in concluding that any normally-lives-or-works carve-out applies only to "regular workspace[s]" and, therefore, could not cut down the charges. *Id.* (citing *McHugh*, 2022 WL 296304, at *22). Absent again, though, was any explanation of how this accords with fair notice.

Federal Defender Services
of Wisconsin, Inc.

Accordingly, the analyses in *Puma* and *Andries* should not sway this Court. They are in tension with the Supreme Court's guidance on interpreting statutes consistent with the ordinary person's understanding and without blind adherence to dictionaries. And missing entirely is any explanation of how a "regular" versus "not regular" distinction among offices is a workable standard that affords fair notice to the ordinary person. For these reasons, the Court should not be persuaded by these cases.[4] Count Five must be dismissed.

### III.   The Government's arguments do not render Count Seven sufficiently pleaded.

Mr. Beeks's opening brief established that Count Seven does not adequately allege a violation of 18 U.S.C. § 231(a)(3)—it is missing essential facts that, if true, would identify a cognizable "civil disorder." *See* Fed. R. Crim. P. 7(c)(1). Not all "civil disorders" trigger liability; instead, only those that affect "the conduct or performance of a federally protected function," "commerce," or "the movement of an article in commerce" qualify. Mot. at 6. Consequently, guilt turns on a question of particularized facts—whether the "civil disorder" falls within the realm of § 231(a)(3). Mot. at 25. And the terms "federally protected function," "commerce," and "the movement of an article or commodity in commerce" are not obvious and unambiguous. They are defined to encompass numerous potential actors and scenarios. 18 U.S.C. § 232; Mot. at 7–8, 23–25. By failing to allege essential facts that color-in the statutory boilerplate, Count Seven fails in two regards: it does not provide Mr. Beeks with notice of the precise offense of which he is accused so that he can prepare his defense, and it fails to ensure that he will be prosecuted for the same offense the grand jury indicted. Mot. at 25–27. Thus, it must be dismissed.

---

[4] The defense is aware of two other courts that already have or soon will issue rulings on this issue. In *United States v. Griffin*, in a minute entry and without analysis, the court denied the defense's motion for judgment of acquittal based on this argument. *See* Minute Entry, *United States v. Griffin*, No. 21-cr-92 (TNM) (D.D.C. Mar. 22, 2022). Separately, this issue remains pending in *United States v. Fischer*, No. 21-cr-234 (CJN) (D.D.C.).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The Government offers a limited response to Mr. Beeks's argument. It contends that parroting the text of § 231(a)(3) is sufficient to allege the "civil disorder" element because guilt does not depend on any particular fact. Opp. at 11. But it does not contest that not all "civil disorders" trigger liability under this statute. Nor does the Government point to any paragraphs in the indictment that, if true, would support a finding that the encounter in the hallway between the Rotunda and Senate chamber was a cognizable "civil disorder." Instead, it recasts the defense's motion as a complaint that the indictment needed to provide additional details about how Mr. Beeks purportedly contributed to the hallway confrontation. *See id.* at 12–13. That is not the argument. As a precautionary measure, the Government attempts to shore up its argument with facts *not* alleged in the indictment—which, of course, this Court cannot consider. And those new allegations in the Government's brief do not resolve the remaining question of what particular facts led the grand jury to conclude that (if proven) the elements of the charged offense would be satisfied with respect to Mr. Beeks.

In other words, the Government's response has not altered the litigation landscape. The notice and presentment problems persist, and each provides a reason to dismiss Count Seven. The cases the Government cites are not to the contrary. In the alternative, if the Court reads the indictment adequately to allege a "civil disorder" that negatively affected a "federally protected function," then Mr. Beeks respectfully requests that the Court dismiss Count Seven in part.

### A. Boilerplate is not enough; the indictment needed to allege essential facts supporting the "civil disorder" element because guilt depends on those facts.

The Government mistakenly insists that the statutory boilerplate in Paragraph 112 of the indictment, standing alone, is sufficient to allege a violation of § 231(a)(3). Opp. at 9. "To be sure," and as the Government stresses, "there are certain criminal offenses in which the statutory text is worded so narrowly that a statement of the elements provides the defendant with sufficient notice

14

of the acts that constitute the specific offense charged against him"; in those cases, parroting the statute is enough. *United States v. Hillie*, 227 F. Supp. 3d 57, 74 (D.D.C. 2017). But, at the same time, "there are also criminal offenses that are broadly worded, and thus 'must be charged with greater specificity' in order to give the defendant sufficient notice of the crime.'" *Id.* (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)).

Section 231(a)(3) falls in the latter camp. Guilt under § 231(a)(3) turns on the identification of particular facts—specifically, facts that cause the purported "civil disorder" to fall within the ambit of the statute and make the defendant's actions prosecutable as a matter of *federal* law. Put differently, the nature of the "civil disorder" "is central to every prosecution under the statute." *See Russell v. United States*, 369 U.S. 749, 764 (1962). And the statute defines that "civil disorder" using terms that capture a wide array of actors and conduct; nearly every type of police officer may qualify as "law enforcement"; a substantial number of federal actors (or entities) performing duties under federal law may be engaged in a "federally protected function"; and "commerce" is defined as *itself*, occurring across state lines or intrastate. *See* 18 U.S.C. § 232(2), (3), (7). By relying on the generic language of the statute, the indictment here leaves Mr. Beeks "to go to trial with the chief issue undefined"—whether his alleged acts are of the type that this statute even punishes—and "[i]t gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture." *See Russell*, 369 U.S. at 766.

The Government resists applying *Russell* here (Opp. at 11), but a closer look at that case supports the defense's argument. In *Russell*, the Supreme Court assessed what was required to state an offense under 2 U.S.C. § 192, which criminalizes a witness's refusal to answer questions "pertinent to the question under inquiry" at a congressional hearing. 369 U.S. at 764. Unless the indictment alleged the essential facts of the subject matter of the hearing (the "question under

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

inquiry"), the Court reasoned, the defendant could not know whether her obstructive act (refusing to answer) was the kind that the statute criminalized. *Id.* at 764–65. Similarly, § 231(a)(3) criminalizes a person's act of obstructing law enforcement engaged during a particular kind of "civil disorder"—one that affected a "federally protected function," "commerce," or "the movement of an article or commodity in commerce." Unless the indictment alleges the essential facts underpinning the "civil disorder," the defendant cannot know whether his purportedly obstructive act was the kind that the statute criminalized. Thus, under *Russell*, in the same way that simply parroting the language of § 192 is not sufficient to state an offense, simply parroting the language of § 231(a)(3) is not enough to state an offense.[5]

The cases the Government cites concern other statutes and serve only to underscore the different language in § 231(a)(3). For example, the Government points to *United States v. Williamson*, in which the D.C. Circuit reaffirmed that "parroting the statutory language is 'often sufficient,' [but] that is not invariably so." 903 F.3d 124, 131 (D.C. Cir. 2018) (cited at Opp. at 11–12). On the facts presented, the court concluded that 18 U.S.C. § 115(a)(1)(B), which criminalizes threatening a federal official in retaliation for his performance of "official duties," did not require the Government to plead essential facts concerning the "official duties" because guilt did not turn on those specific facts. 903 F.3d at 131. But the court of appeals' explanation helpfully underscores the difference between that statute and this one. Section 115, the court explained, "speaks in terms of a threat made 'on account of the performance of official duties,' *not to draw attention to a particular official duty*, but instead to assure that the threat generally relates to the

---

[5] The Government cites one case from another District that reached the opposite conclusion. Opp. at 13–14 (citing and discussing *United States v. Phomma*, No. 3:20-cr-465-JO, 2021 WL 4199961, at *7 (D. Or. Sept. 15, 2021)). The defense notes, however, that that court did not engage in a close analysis of *Russell*, and the logic of *Russell* compels the defense's position in this case.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

officer's performance of official duties rather than to a personal dispute[.]" *Id.* at 131 (emphasis added). In contrast, § 231(a)(3) speaks in terms of an obstructive act made against an officer engaged in relation to a *particular kind* of "civil disorder" in order to assure that the defendant's act relates to that *particular kind* of "civil disorder." And this makes sense, because the "civil disorder" element is what makes § 231(a)(3) a federal offense; it ties purely local conduct to a federal function or commerce. In contrast, § 115(a)(1)(B)'s reference to "official duties" does not affect the federal character of the statute, because it reaches a defendant's threats against only federal actors. *See id.* § 115(a)(1)(B) (criminalizing threats against federal officials, judges, law enforcement, and other employees or officers listed in § 1114).

Further, the Government is mistaken in suggesting that the D.C. Circuit has rejected an argument "identical" to the one the defense makes here. Opp. at 12. To the contrary, in *United States v. Verrusio*, the D.C. Circuit again reaffirmed the first principles on which Mr. Beeks's argument relies. 762 F.3d 1, 13 (citing *Russell*, 369 U.S. at 763–64). In that case, the defendant had challenged whether the indictment adequately alleged an "official act." *Id.* at 11. In finding that it had, the court acknowledged that "[n]ot all acts that an official performs" fall within the statute, but the indictment contained detailed factual allegations that, if true, identified a cognizable "official act." *Id.* at 12, 13–14. The quote the Government pulls into its brief comes from the end of the court's discussion, in which it rejected a suggestion that *additional* facts needed to be alleged. *Id.* at 14–15. Mr. Beeks's challenge asks this Court to determine whether the indictment adequately alleges facts to support finding a cognizable "civil disorder," just like the *Verrusio* court analyzed whether the indictment adequately alleged facts to support finding a cognizable "official act." Thus, rather than foreclose Mr. Beeks's argument, *Verrusio* supports it.

Federal Defender Services
of Wisconsin, Inc.

It follows that, contrary to the Government's suggestion, Mr. Beeks has not "conflate[d] pleading with proof" requirements. *Cf.* Opp. at 10 (internal quotation marks omitted). When it comes to § 231(a)(3), guilt "depends so crucially upon" identification of the particular kind of "civil disorder" that it must be alleged through factual allegations, not statutory boilerplate alone. *See Russell*, 369 U.S. at 764. The defense is not asking the Court to make a factual determination that the government *cannot* prove a cognizable "civil disorder"; it is asking the Court to conclude that the indictment does not allege essential facts that, if true, would constitute a cognizable "civil disorder." For this reason alone, Count Seven should be dismissed.

**B.    The Government has not pointed to any factual allegations in the indictment that ensure it is prosecuting the same offense as the grand jury indicted.**

The Government has not responded to Mr. Beeks's independent argument that Count Seven must be dismissed because it violates his right to be tried only upon charges found by a grand jury. In the absence of any allegations of *fact* concerning what was the "federally protected function," "commerce," or "movement of an article or commodity in commerce" negatively affected by the "civil disorder," it is impossible to know what led the grand jury to conclude that that element would be satisfied. Mot. at 26. As *Hillie* explained, "in the absence of a written charge that includes this factual basis for the grand jury's probable cause finding, one cannot know with the requisite degree of certainty that the criminal charges that appear in the indictment are actually based on the information so presented." 227 F. Supp. 3d at 77 (emphasis omitted).

Rather than point to paragraphs that set out the facts on which the grand jury relied when indicting Mr. Beeks, the Government has backfilled the indictment with a statement of what it intends to prove at trial. Opp. at 14–15. It asserts two *new* "federally protected functions" concerning the Capitol police and Secret Service, and a *new* theory concerning "commerce" and "the movement of an article or commodity in commerce" arising from a curfew affecting

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

businesses. *Id.* Tellingly, the Government does not argue that *any* of those facts are in the indictment.

And, in fact, they *do not* appear in the indictment. Although the Capitol police are alleged to have been present at the Capitol, there is no allegation that the hallway encounter (which did not involve those officers) affected the Capitol police officers' performance of their duties. There also is no allegation that the hallway confrontation affected the Secret Service's protection of the Vice President. In fact, the words "Secret Service" do not even appear in the indictment. And there is no allegation concerning any commercial effects flowing *from* the hallway confrontation, let alone reference to a curfew or continuing commercial fall-out, days later. Even if the Government were to represent that the grand jury was told to consider these three theories as the basis for the indictment *and* that it had provided the grand jury with proof of the same (a representation it has not made), that would not be enough. *E.g.*, *Hillie*, 227 F. Supp. 3d at 77 (rejecting government's representations as to what the grand jury "was orally instructed to consider").

It follows that the Government's response serves only to confirm that the indictment runs afoul of Mr. Beeks's constitutional rights. In the absence of factual allegations that would make the "civil disorder" cognizable, the indictment does *not* assure that Mr. Beeks is being prosecuted for the same offense that the grand jury indicted. Instead, the Government has supplemented the boilerplate in the indictment with multiple theories of why it believes the offense is prosecutable. The situation here matches what the D.C. Circuit has criticized: use of boilerplate language that gives the Government "a free hand to insert the vital part of the indictment without reference to the grand jury." *United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) (per curiam). The Government cannot now supply the facts that should have been alleged in the indictment. *See United States v. Thomas*, 444 F.2d 919, 922 (D.C. Cir. 1971) ("the principal harm suffered by the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

[accused] because of the lack of precision in the indictment results from his inability to discern the specific underlying offense, if any, that the grand jury had in mind when it returned the indictment"). There is nothing to prevent the Government from switching theories again.

> **C.**     **Even if the "civil disorder" is the Capitol breach generally, rather than the hallway encounter specifically, Count Seven must be dismissed.**

The defense reads the phrase "civil disorder" in Paragraph 112 to refer to the spotlighted encounter between the "mob" and law enforcement in the hallway between the Rotunda and Senate chamber, and the Government has not argued otherwise. However, the Court may read the indictment to allege that the "civil disorder" was the Capitol breach, more broadly.

But on that reading, the Court *still* should dismiss Count Seven. By relying on the boilerplate phrase "civil disorder," it is not clear what the grand jury understood the "civil disorder" to be. It could have thought the Capitol breach, generally, was the "civil disorder"; or, it could have thought the hallway confrontation, specifically, was the "civil disorder." In the absence of any essential facts tethered to that term, the indictment also leaves ambiguous the nature of the charge against Mr. Beeks. In other words, the pleading and presentment issues just discussed remain unchanged.

> **D.**     **In the alternative, Count Seven should be dismissed in part.**

At a minimum, the defense submits that Count Seven must be dismissed at least in part. If that Count states an offense, then the conclusion would be a narrow one: that the "civil disorder" is the Capitol breach, generally, and that that breach negatively affected the "federally protected function" of the U.S. Capitol police patrolling the building and grounds. The indictment still would lack any allegations that the "civil disorder" impacted "commerce" or the "movement of any article or commodity in commerce." Thus, even under that alternate reading, Count Seven should be dismissed insofar as it rests on that unsupported boilerplate.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## CONCLUSION

The Government's response has not offered the Court a ground on which to deny Mr. Beeks

motion to dismiss Count Five or Count Seven. With respect to Count Five, the Government invites

the Court to transform the phrase "temporarily visiting" in § 1752 into a mere-presence

requirement or, in the alternative, maintain the Count despite the lack of fair notice. With respect

to Count Seven, the Government suggests that statutory boilerplate alone suffices to state a

violation of § 231(a)(3), even though guilt under that statute depends crucially on the facts

underpinning the purported "civil disorder." And it offers no response to the presentment issues

that Mr. Beeks has raised. For these reasons, Counts Five and Seven should be dismissed.

Dated at Madison, Wisconsin, this 15th day of April, 2022.

Respectfully submitted,

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger (D.D.C. Bar No. D00483)
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 E. Mifflin Street, Suite 1000
Madison, WI 53703
Tel.:  (608) 260 9900
Email:  jessica_ettinger@fd.org

Joshua D. Uller (WI Bar No. 1055173)
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
411 E. Milwaukee Avenue, Suite 2310
Milwaukee, WI  53202
Tel.:  (414) 221-9900
Email:  joshua_uller@fd.org

*Counsel for James Beeks*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**CERTIFICATE OF SERVICE**

On this 15th day of April, 2022, I filed the foregoing document electronically with the

Clerk of the Court for the United States District Court for the District of Columbia by using the

Court's CM/ECF system, which will provide electronic service on all counsel of record.


*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger