# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 22-cr-15 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **DONOVAN CROWL,** | : | |
| | : | |
| **SANDRA PARKER,** | : | |
| | : | |
| **BENNIE PARKER,** | : | |
| | : | |
| **LAURA STEELE,** | : | |
| | : | |
| **CONNIE MEGGS,** | : | |
| | : | |
| **WILLIAM ISAACS, and** | : | |
| | : | |
| **JAMES BEEKS,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

Defendant Connie Meggs has moved to transfer venue in this case to the Eastern District of Virginia.  ECF No. 654.  No other defendants in this case have joined this motion to date.  The defendant fails to establish that she "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny her motion.[1]

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion.  *See United States v. Alford*, No. 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 1238654 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

The Indictment alleges that the defendants joined and took acts in furtherance of a conspiracy to obstruct the Certification of the 2020 Presidential Election on January 6, 2021, and participating in the attack on the Capitol that same day. ECF No. 583. Based on this conduct, the defendants have been charged with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); conspiracy to prevent an officer from discharging any duties, in violation of 18 U.S.C. § 372; and destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 2. *Id.* Several defendants are additionally charged with civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2; and one defendant is charged with tampering with documents or proceedings and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1), 2. *Id.*

Defendant Connie Meggs now moves for a change of venue. ECF Nos. 654. This is not the first such motion to be filed in this case. Defendant Caldwell, previously charged in this matter, filed a motion to transfer venue last year, ECF No. 273, which the Court denied without prejudice, 21-cr-28 ECF No. 415. *See also* ECF No. 8 (adopting the record from 21-cr-28 (APM) as part of the record of the instant case). In its Order denying the transfer request, this Court observed, "In

short, Caldwell has not put forth a scrap of evidence to support his claims of jury bias, and his motion to transfer venue is denied without prejudice."  ECF No. 415.  In Defendant Meggs' new motion, she supports her request for transfer by citing census data and the results of three surveys of District of Columbia residents about their views regarding January 6 and the criminal cases arising from the events of that day.  The data cited in the defendant's motion fails to establish the extraordinary local prejudice that would be necessary for this Court to presume, without engaging in voir dire, that this district's jury pool cannot provide the defendants a fair trial.

## **ARGUMENT**

The defendant contends that she will not have a fair trial in the District of Columbia because the nature, proximity, and extent of pretrial publicity about January 6 has irreparably tainted the jury pool here in the District of Columbia.  The surveys and arguments cited in the motion, however, fail to show (1) that anything about the size or characteristics of this district make it particularly ill-suited to supply a fair and impartial jury pool; (2) that pretrial publicity has affected the jurors in this district any more than anywhere else in the United States; (3) that the potential jurors in this district have become so biased against these defendants as to create a presumption of prejudice; and (4) that the normal voir dire process is insufficient to identify and disqualify biased jurors.

## I.    **Legal Standard**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place."

*United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 6654, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d

31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## II.   Prejudice Should Not Be Presumed Under the *Skilling* Factors.

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14,

15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 19654 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, these factors do not support a presumption of prejudice in this case.

**A.      The size and characteristics of the jury pool in the District of Columbia do not support a presumption of prejudice.**

The defense contends that the District's size and characteristics support a presumption of prejudice.  First, defendants observe that the District of Columbia has fewer than 700,000 residents and a transient population.  ECF No. 654 at 5 (citing *Skilling*, 561 U.S. at 382).  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Id.*

The defense also argues that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  ECF No. 654 at 7-9.  The defense cites polling data it commissioned that found that 66% of survey respondents in the District of Columbia had felt an increased concern for their safety due to the events of January 6.  *Id.* at 7.  But January 6 is now more than a year in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location

where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (19654 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

> **B.     The nature and extent of the pretrial publicity do not support a presumption of prejudice.**

The defendant has failed to show that the residents of the District of Columbia have been bombarded with such prejudicial publicity that they could not be unfair or that they have been exposed to significantly more news regarding the January 6 attacks than other potential jurors across the country.  The defendant argues that prejudice should be presumed based on statements by Members of Congress, the Attorney General of the United States, and other political leaders. ECF No. 654 at 10-15.  But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the

bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61. The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about the defendants charged herein. And, again, statements by politics leaders like Members of Congress and the Attorney General are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6. ECF No. 654 at 21. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And a comparatively small percentage of the news coverage of January 6 has focused on the individual defendants in these cases themselves. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest);

*United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 1238654, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Indeed, many of the news stories that the defendants cite in their motion were published by media organizations with wide national circulation, not purely local outlets.

Thus, the nature and extent of the pretrial publicity regarding the events of January 6 do not support a presumption of prejudice in this case.

**C.    The passage of time before trial and the possibility of a favorable jury verdict weigh against a presumption of prejudice.**

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 16 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, only a relatively small percentage of the recent stories have mentioned these particular defendants, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

**D.    The fourth *Skilling* factor suggests the presumption of prejudice is—and should be—rarely applied.**

Because these defendants have not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a

case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

III.  **The Polling Data Cited by the Defense Does Not Establish a Bias Among Potential D.C. Jurors That Would Preclude a Fair and Impartial Trial.**

The defense cites three surveys of District of Columbia residents to contend that this district's jury pool is so strongly biased against these defendants that this Court should apply a presumption of prejudice in holding the trial here.  The first survey cited by the defense is a "community attitudes survey" that the defense commissioned In Lux Research to administer ("the defense survey" or 'the ILR survey"); the second is the poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia; and the third is a survey conducted by John Zogby Strategies, and cited in *United States v. Garcia*, Case No. :21-cr-00129-ABJ, ECF No. 54-1.  Each of these polls has flaws that undermine the conclusions the defendant draws from them, and none of them suggests that the normal voir dire process will be insufficient in this case to root out potential prejudice and select a fair and impartial jury.

A.  **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

The defendant argues that this Court should find a presumption of prejudice based on three polls of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the

"argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon ]administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 654% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir

dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the

ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And the defense has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as explained below, the polls cited by the defense do not support a presumption of prejudice in any event.

> **B.    The polls cited by the defense have shortcomings in their design that undercut defendants' argument that they show extreme prejudice in this district's jury pool.**
>
> > i.    <u>The ILR and Select Litigation surveys contain overly generalized questions that failed to ask respondents whether they could keep an open mind about the guilt of particular defendants.</u>

The defense cites the ILR survey they commissioned to assert that D.C. residents have a "decidedly negative" view towards defendants charged in the January 6-related cases and therefore cannot be fair and impartial jurors in these cases.  ECF No. 654 at 6 (citing ECF No. 654-1 at 2). The ILR survey does not support this conclusion.

According to the survey summary, "91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case," but the wording and framing of these questions were flawed.  The questions categorized as "prejudgment questions" were:

> (1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty?  Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

> (2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, 3) A riot, 4) A protest that got out of control, 5) A rally." (82% of D.C. respondents chose insurrection, attack, or riot.)

> (3) "Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?" (71% of D.C. respondents selected "planned in advance.")

> (4) "Do you believe The Events of January 6th were racially motivated?"  (40% of D.C. respondents answered in the affirmative.)

None of these questions asked respondents whether they would keep an open mind in the context of a specific case.  *Cf. United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 1238654, at *2 (D.D.C. Jan. 12, 2022) ("[T]here is no reason to believe that members of the jury venire will even know who [the defendant] is or what he allegedly did on January 6, much less that a significant number of the members of the venire will lack the capacity to evaluate the case against Defendant based solely on the facts of his case.") (emphasis omitted).

In attempting to justify this approach, the ILR Survey administrator wrote, "Because respondents overwhelmingly show no interest in considering any one January 6th defendant as

different from the group of all defendants, it was not necessary to interpose names into the survey questions at the time this Study was conducted." ECF No. 654-1 at 21. The "prejudgment" survey questions called for gross generalizations, however. The questions did not give respondents an option to consider any one January 6th defendant as different from the group of all defendants. Perhaps because of this, it is worth noting that between 7-13% of D.C. respondents opted not to answer each of these questions. Additionally, while the survey administrator sought to justify their lack of asking how respondents would approach particular cases by citing the dangers of poisoning the jury pool with references to particular defendants, one need not interpose the names of particular defendants into a survey to ask whether respondents would judge particular defendants on the facts of their particular cases.

The ILR survey also shows that some percentage of respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments." 654-1 at 25 (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed jurisdictions thought entry into the Capitol was planned in advance, and between 11% and 20% believed the events of January 6 were racially motivated). This demonstrates that a careful voir dire would be necessary in any jurisdiction, and it fails to show that voir dire would be inadequate to weed out biased jurors in the District of Columbia.

When the ILR survey asked the key question in jury selection—whether a prospective juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court," *Irvin*, 366 U.S. at 722-23—the survey responses undermined the defendants' claim that prejudice should be presumed in this district. When asked whether it would be "possible for you to be a fair and unbiased juror for a January 6th Defendant," ECF No. 654-1 at 23, a full 70.13% of D.C. respondents said that they "could," *id.* at 26. This number was actually *higher* than the

affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%). *Id.*

The ILR survey asserts that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality." ECF No. 654-1 at 5. But it fails to justify that assertion. It claims that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 22, 25, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 5. But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial. *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C. respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial. Moreover, when asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts. *Id.* at 26 (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia). Thus, even when controlling for respondent's potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions. Nor were D.C. respondents significantly more likely to worry about negative consequences if they were to "find[] a January 6th defendant Not Guilty." *Id.* at 22, 26 (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina,

and 18.56% in Eastern Virginia).  The ILR survey does not support the conclusion that an impartial jury cannot be found in Washington, D.C.

Furthermore, to the extent the ILR poll is useful at a more general level in comparing the District of Columbia to other districts, the poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates.  ECF No. 654-1 at 24 (Question 1) (654.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia).  The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions.  The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you."  ECF No. 654-1 at 21 (Question 4).  The percentage of respondents reporting "[a]t least 10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions.  ECF No. 654-1 at 24.  And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions.  *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions).  The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small different does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

Similarly unavailing is the Select Litigation poll commissioned by the D.C. Federal Defenders Service and cited by the defendants in this case for its finding that 71% of respondents

in D.C. said they had formed the opinion that January 6 arrestees were "guilty" of the charges brought against them.  *See* ECF No. 654 at 19 (citing 654-2 at 14).  This survey also failed to identify (much less define) any of the charges brought against the defendant, and it failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area.  *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion.").  The survey instead gave respondents a binary choice between "guilty or not guilty."  ECF No. 654-2 at 14.  Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused."  *Id.*  Like the 27% of respondents to the ILR poll who either said it was "too early to decide" guilt or declined to answer the question, these responses to the Select Litigation poll show that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, these polls do not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice.  In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% (Select Litigation Survey) or 72% (ILR survey) here.  *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  Moreover, the survey in *Haldeman* (a) prompted defendants to consider whether they could actually form an opinion and (b) reminded respondents of the presumption of innocence before asking them to opine as to whether the defendants were "guilty or innocent in the Watergate affair."  *Id.* at 178 n.2.  Here, by contrast, respondents were not told about the presumption of innocence, and were asked only whether,

generally, they thought those charged in connection with January 6 were "guilty."  ECF No. 654-1 at (Question 3), 654-2 at 14 (Questions 3, 4).  Furthermore, neither poll answered the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box").  In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

Indeed, when asked about guilt in the context of a criminal trial, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  ECF No. 654-2 at 14.  In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused."  *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

       ii.   <u>The defense misstates the conclusions of the Zogby Poll, and aspects of that poll's methodology render it unreliable.</u>

The defense cites the Zogby poll initially filed in the *Garcia* case for its conclusions that: (1) 88% of registered D.C. respondents said they felt that if Garcia went inside the Capitol building

on January 6, 2021, he should be convicted of obstruction of justice and civil disorder; (2) 73% of respondents stated that anyone who merely entered the Capitol building on January 6 is guilty of insurrection; (3) 64% of respondents believed that anyone who entered the Capitol building on January 6 is responsible for other protestors' violence and destruction of property; and (4) 70% of respondents held the view that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.  ECF No. 654 at 20.

First, these conclusions are not actually what the Zogby survey found.  The poll did not find that "88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6 . . . he should be convicted of obstruction of justice and civil disorder."  In fact, the Zogby poll shows that this belief was held by 125 (88%) of the 143 respondents who were (a) familiar with the events of January 6 *and* (b) familiar with the Proud Boys *and* (c) familiar with Defendant Garcia himself.  ECF No. 654-3 at 27 (125 of 143).  When the respondents who lacked this familiarity are accounted for, the percentage of overall respondents believing Garcia should be convicted if he entered the Capitol falls to 31%.  *Id.* at 19, 27 (125 of 401).  That is hardly sufficient to support a presumption of prejudice.

Similarly, it is not true that "73% of respondents [to the Zogby poll] believed that anyone who merely entered the Capitol building on [January 6] is guilty of insurrection."  In fact, the Zogby poll showed that 73% of respondents who were "Very familiar" or "Somewhat familiar" with January 6 held this belief.  ECF No. 654-3 at 22 (277 of 380 respondents).  When respondents who were "Not familiar/Not sure" are taken into account, the percentage falls to 69%.  *Id.* at 19, 22 (277 of 401 respondents).  And this does not raise a presumption of prejudice.  In *Patton v. Yount*, nearly 99% of prospective jurors had heard of the case, and 77% indicated on voir dire that "they would carry an opinion into the jury box," yet the Supreme Court rejected a claim of

presumed prejudice.  *Patton*, 467 U.S. at 1029.  Thus, the number of poll respondents who had

formed a general opinion about January 6 defendants was lower than in *Patton*, even though the

Zogby poll did not ask respondents whether they could set aside their opinions and determine guilt

based solely on the evidence if called as jurors.  *Compare Haldeman*, 559 F.2d at 144, 178 n.2

(MacKinnon, J., concurring in part and dissenting in part) (61% of survey respondents held the

opinion that defendants were "guilty" in connection with Watergate even when provided a survey

option for "Not Guilty Until Proven").  At most, these responses indicate the Court might have to

call a somewhat larger venire in order to find 12 impartial jurors; they do not demonstrate that it

is impossible to pick an unbiased jury.

Second, there are particular reasons to doubt the reliability of the Zogby poll provided in

the *Garcia* case.  For one thing, the poll does not provide the Court with all the information needed

to assess its accuracy.  The American Society of Trial Consultants' Professional Standards for

Venue Surveys state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he
> questionnaire that was used in the survey, identification of the primary persons
> who performed the work (including their qualifications), and descriptions of how
> each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection.
> - Calculation of sample completion rate.
> - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7,

available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

The Zogby poll fails to provide critical information, such as how the 400 survey

participants were selected for the "online survey" and whether they self-selected.  ECF No. 654-3

at 2.  *See United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at *2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?").  Additionally, the explanation that is provided indicates that the poll was underinclusive, in that it was only of "Washington DC registered voters," ECF No. 654-3 at 2, whereas this Court's jury pool is generated based on voter registration, Department of Motor Vehicles records, and D.C. income tax forms.  Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors at 1, available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.

Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *See Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions).  For example, Question 8 asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building and people's lives, some of which were lost, but the events were not insurrectionist and did not pose a threat to US democracy."  ECF No. 654-3 at 21, 40.  These answers, in addition to being compound, forced respondents into a binary choice between extreme options.  For example, there was no choice for someone who believed the events *did* pose a threat to U.S. democracy but did not approach the level of 9/11, Pearl Harbor, or the Civil War.  Nor was there a choice for someone who believed the events did *not* pose a threat to U.S. democracy but was also unwilling to describe them as "unwise" or "senseless."

The survey's next question asked whether respondents believed that "any individual who

was inside the US Capitol on January 6, 2021 should be convicted of insurrection."  ECF No. 654-3 at 22, 40.  This question is poorly worded, considering that hundreds of "individual[s] who w[ere] inside the US Capitol on January 6" had every right to be there, including the Vice President, the members of Congress, and the U.S. Capitol Police and U.S. Secret Service.  Moreover, the question provided no background on potential criminal offenses involved in the events of January 6 other than "insurrection"—which the question does not define or describe, *see* 18 U.S.C. § 2383, and with which no defendant has been charged in connection with the events of January 6.  And the setup for this question naturally prompted respondents to condemn the actions of January 6 rather than to consider whether they actually believed everyone who entered the Capitol without permission was an insurrectionist.  In short, these questions have the earmarks of an inappropriate "push poll" that is "primarily designed to influence survey respondents' opinions in a particular direction by presenting systematically biased information."  ASTC Professional Standards for Venue Surveys at 7; *see id.* at 8 ("Efforts should be made to avoid context, wording or other influences that raise the likelihood of responses due to social desirability or other response bias."); *Campa*, 459 F.3d at 1146 (observing that "the survey was riddled with non-neutral questions").

The poll's executive summary also misstates the poll's own findings.  For example, it claims that "[n]early 3 out of 4 respondents (73%) believe that any individual who was inside the Capitol on January 6, 2021 should be convicted of insurrection."  ECF No. 654-3 at 3.  In fact, the detailed findings show that 73% of those *who were "Very familiar" or "Somewhat familiar" with January 6* held this belief.  *Id.* at 19, 22.  The claim fails to account for the 5% of respondents who answered "Not familiar/Not sure" when asked about their familiarity with January 6.  *Id.* at 19.  The executive summary also states that "Close to 9 out of 10 respondents (88%) who are familiar with Mr. Garcia, felt that if he were shown to have been inside the Capitol building on January 6,

2021 he should be convicted of obstruction of justice and civil disorder." *Id.* at 3 (removing emphasis). Again, however, it was not 88% of "respondents . . . familiar with Garcia" who held this belief, but rather 88% of respondents famiiar with (a) the events of January 6, (b) the Proud Boys, and (c) Garcia. *Id.* at 19, 23, 27. This represented only 31% (125 of 401) of the poll's total respondents. The executive summary omits important qualifiers when reciting the poll's findings, further calling into question its reliability.

iii. <u>This Court should not rely on survey data over voir dire to assess the ability of D.C. jurors to be fair and impartial to these defendants.</u>

All the findings of the surveys cited in the defense motion suffer from the same flaw—they fail to show a level of bias against these particular defendants that require this Court to presume prejudice, forgo voir dire, and transfer venue to another jurisdiction. In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

**IV.    The Voir Dire Process in the First Four January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

"In the end, the appropriate way to identify a biased juror pool is through voir dire." *United States v. Thomas Webster*, Case No. 21-cr-208 (APM)- (D.D.C. April 18, 2022, Mehta, J.), slip op. at 2 (citing *Haldeman*, 559 F.2d at 63 ("And if an impartial jury actually cannot be selected, that fact should become evident at the voir dire.")). At this point, four other January 6 cases have

25

proceeded to jury trials, in which voir dire has been successful in identifying unbiased jurors without undue time and effort by the district court. *Cf. Skilling*, 561 U.S. at 384 ("Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup voir dire were well suited to that task."). As this Court knows, from having presided over the latest of those jury trials, the voir dire processes undertaken in these first few trials demonstrated that the majority of prospective jurors were able to set aside any preconceived opinions about the defendants' guilt or innocence and decide the case based on the evidence in those particular cases.[2]

Prospective jurors in these first trials were asked about whether they had viewed media coverage of January 6. *See United States v. Reffitt*, 21-cr-32 (DLF) (D.D.C.), Voir Dire Tr. at 22-23 (Voir Dire questions 3, 4); *United States v. Robertson*, 21-cr-34 (CRC) (D.D.C.), Voir Dire Tr. at 14 (Voir Dire questions 17, 18). While many jurors reported seeing some coverage of the events of January 6, either contemporaneously or afterwards, very few reported being avid consumers of news about this topic, and most could not provide the names of any particular defendants they saw covered. Rather, most prospective jurors who had memories of seeing coverage of specific defendants could only identify the subjects they had heard about with descriptors like "the guy with the horns." *Reffitt*, Voir Dire Tr. *at 81, 210, 436; see also Robertson*, Voir Dire Tr. at 67 (prospective juror reporting possibly viewing news coverage of Defendant Robertson because the juror recalled seeing coverage of someone with a large wooden stick, which the Court had

---

[2] The transcripts from the voir dire proceedings in *Reffitt* and *Robertson* are being submitted under separate cover to the Court and counsel. The government has requested but has not yet received back the transcripts from the voir dire proceedings in *United States v. Dustin Thompson,* 21-cr-161 (RBW), and *United States v. Webster*, 21-cr-208 (APM). Accordingly, while the government trial counsel in those matters reported, based on their recollections and notes, a similar voir dire experience to that of the *Reffitt* and *Robertson* trials, the government is not able to provide more detailed analysis of the *Thompson* and *Webster* trial's voir dire process here.

discussed in going over the statement of charges at the start of voir dire).

The presiding judges in these first January 6 trials also asked prospective jurors questions to elicit any prejudgment or bias.  In *Reffitt*, this was covered in two main questions: Question 5, which asked whether prospective jurors had "such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case," and Question 6, which queried, "[D]o you have an opinion about Mr. Reffitt's guilt or innocence in this case?"  Voir Dire Tr. at 23.  Of the 56 prospective jurors examined in *Reffitt*, 24 (or 43%) answered yes to one or both of these questions.[3]  When asked follow-up questions, only nine of these 24 prospective jurors were struck for cause based on their statements suggesting that they would not be able to set aside their feelings and decide the case impartially.[4]  Of the remaining 15 prospective jurors who answered yes to Questions 5 and 6, five were struck for other reasons[5] and ten were qualified after clarifying that they could decide the case fairly and impartially.[6]  In other words, removing the jurors who were struck for other reasons, only nine of 56 prospective jurors (or 16%) claimed to have such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for them to serve as a fair and impartial juror and were then struck for

---

[3] *See* Voir Dire of Jurors 0038, 0045, 0313, 0328, 0344, 0365, 0432, 0443, 0457, 0464, 0514, 0548, 0728, 1046, 1054, 1221, 1332, 1419, 1484, 1486, 1541, 1566, 1655, 1747.  The table attached as Exhibit 1 sets forth the transcript citations where each juror's individual voir dire can be found.

[4] *See* Voir Dire of Jurors 0045, 0328, 0432, 0443, 0514, 1046, 1484, 1541, 1747.

[5] *See* Voir Dire of Jurors 0313, 0464, 0548, 0728, 1054.

[6] *See* Voir Dire of Jurors 0038, 0344, 0365, 0457, 1221, 1332, 1419, 1486, 1566, 1655.

cause.[7]

  The voir dire process in the *Robertson* case produced similar results.  The presiding judge in *Robertson* asked two main prejudgment or bias questions: Question 19, which inquired whether prospective jurors had "such strong feelings about the events of January 6, 2021, that it would be difficult for [the prospective juror] to follow my instructions and render a fair and impartial verdict if you were chosen as a juror," or Question 15, which asked, "Is there anything about the nature of these allegations that would prevent you from being neutral and fair in evaluating the evidence in this case?" *Robertson*, Voir Dire Tr. at 13-14.  Of the 49 prospective jurors examined in *Robertson,* only four (or 8%) answered yes to either Question 19 or Question 15.[8]  Another eight prospective jurors raised issues about their ability to be fair in answering other questions (*i.e.*, the questions about knowing the parties or living near the Capitol) or through talking to the judge and the attorneys in the course of voir dire generally.[9]  In total, only about 12 out of 49 (or 24%) of prospective jurors in *Robertson* raised concerns about their ability to be fair or impartial.  After being asked follow-up questions, only nine of these 12 prospective jurors were struck for cause.[10]  In other words, removing the jurors who were struck for other reasons, only nine of 49 prospective jurors in *Robertson* (or 18%) claimed to have such strong feelings or opinions about the events

---

  [7] Incidentally, the experience of the voir dire process in the *Reffitt* and *Robertson* cases tracks aspects of the ILR survey commissioned by the defendants in this case.  When asked, "Would it be possible for you to be a fair and unbiased juror for a January 6th Defendant?" 70% of District residents answered, "Yes," and only 18% responded, "No."  ECF No. 654-1 at 23-24, 27.

  [8] *See* Voir Dire of Jurors 0254, 1010, 1219, 1566.

  [9] *See* Voir Dire of Jurors 0429, 0585, 0696, 0799, 06546, 1160, 1431, 1567.

  [10] *See* Voir Dire of Jurors 0429, 0585, 0696, 0799, 06546, 1010, 1160, 1431, 1567.  Another six jurors were struck for cause having to do with not residing in the District, or hardship reasons. *See* Voir Dire of Jurors 0474, 0505, 0846, 1026, 1122, 1566.

that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for them to serve as a fair and impartial juror and were then struck for cause. *Compare Murphy*, 421 U.S. at 803 (where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt," the number of strikes "by no means suggeste[d] a community so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own"), *with Irvin*, 366 U.S. at 727 (giving "little weight" to prospective jurors' "statement[s] of impartiality" where 268 of 430 prospective jurors (62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner").

Most recently, in *Webster*, this Court observed that it was able to "qualify 35 jurors after questioning 53 of them" and that only "about 50 percent" of the 18 people stricken for cause were stricken based on an expressed inability to be impartial, as opposed to a connection to the offense. *Webster*, 4-26-22 Tr. at 6-7. This Court also observed that "the actual number of folks that were stricken for cause based on their representation that they couldn't be fair and impartial was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Id.* at 7.

Thus, jury selection in the January 6-related trials held to date has confirmed that voir dire functions as anticipated and adequately screens out those prospective jurors who cannot sit fairly and impartially, leaving more than sufficient qualified jurors to hear the case.[11] Further, in this case, the Court has determined that it will utilize a pre-trial jury questionnaire, which the parties

---

[11] Defendants note that the first two January 6-related jury trials resulted in "unanimous jury verdicts promptly returned," observing that the *Reffitt* jury returned a guilty verdict in two hours, and the *Thompson* jury rendered its verdict in three hours. ECF No. 654 at 16. But these relatively prompt verdicts do not indicate bias given that each of these trials was completed in just a few days. And although *Skilling* noted that an acquittal on some counts "undermine[d] . . . the supposition of juror bias," 561 U.S. at 383, it did not suggest that it would have presumed bias in the absence of a split verdict.

are currently working to craft in order to elicit from jurors any bias or prejudgment that might preclude them from being fair or impartial.[12]   The Court should allow this process to take place, assess through the voir dire process whether a fair and impartial jury can be selected from a District of Columbia venire, and decline the defendants' request to short-circuit this process by presuming prejudice and transferring this case to another district.

**VI.    The Defense Fails to Show That Transfer to the Alexandria Division of the Eastern District of Virginia Would Provide a Significantly Different Venire.**

The defense contends that venue is appropriate in the Eastern District of Virginia because that district "offers potential jurors shown to be significantly less biased" and "would result in very little inconvenience for the Court" since the Alexandria courthouse "is just over 8 miles away from the federal courthouse in D.C."  ECF No. 654 at 21-22.  But this argument fails to account for the fact that a jury selected in the Alexandria Division of the Eastern District of Virginia would be drawn only from seven counties in northern Virginia.  *See* United States District Court for the Eastern District of Virginia, Plan for the Random Selection of Grand and Petit Jurors at 6-7, available at https://www.vaed.uscourts.gov/sites/vaed/files/JuryPlanOrder.pdf; Eastern District of Virginia Jurisdiction, available at, https://www.vaed.uscourts.gov/eastern-district-virginia-jurisdiction.  The ILR survey, however, surveyed respondents from the entire Eastern District of Virginia, which is a much larger area.  ECF No. 654-1 at 1 n.2.  The survey responses from the entire district cannot be presumed to be representative of the Alexandria Division, which embraces counties close to Washington, D.C., where residents are exposed to many of the same media sources as D.C. residents.  Indeed, even without limiting its focus to the Alexandria Division, the

---

[12] While questionnaires can be helpful in particular cases, and the government did not oppose the use of a questionnaire in these cases, the government maintains that they are not at all necessary to selecting an impartial jury.

ILR survey shows similar levels of media exposure in this district and the Eastern District of Virginia.  *See* ECF No. 654-1 at 26 (32.02% of D.C. respondents exposed to coverage of January 6 at least ten times per week, compared to 28.04% of respondents in Eastern Virginia).  In short, the defendant cannot show she would obtain a significantly different venire in the Alexandria Division of the Eastern District of Virginia, and she has not requested to be tried in any of that district's other divisions.  A transfer of venue is unwarranted.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   _____
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

_____
Justin Sher
Alexandra Hughes
Trial Attorneys
National Security Division
United States Department of Justice

31

950 Pennsylvania Avenue, NW
Washington, D.C. 20004